**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 30, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA
EX REL., JULIE REED,

     Plaintiff - Appellant,

v.

KEYPOINT GOVERNMENT
SOLUTIONS,

     Defendant - Appellee.

No. 17-1379

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:14-CV-00004-CMA-MJW)**

---

Richard E. Condit, Mehri & Skalet PLLC, Washington, District of Columbia (Steven A. Skalet and Brett D. Watson, Mehri & Skalet PLLC, Washington, District of Columbia, and John T. Harrington and Robert S. Oswald, The Employment Law Group, Washington, District of Columbia, with him on the briefs), for Plaintiff-Appellant.

Robert C. Blume, Gibson, Dunn & Crutcher LLP, Denver, Colorado (Ryan T. Bergsieker and Allison Chapin, Gibson, Dunn & Crutcher LLP, Denver, Colorado, with him on the brief), for Defendant-Appellee.

---

Before **BRISCOE, SEYMOUR**, and **HOLMES**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

The False Claims Act (or the "Act") allows for the recovery of civil penalties and treble damages from anyone who defrauds the government by submitting fraudulent claims for payment. 31 U.S.C. §§ 3729–3733. To enforce its provisions, the Act empowers individuals to file suits on behalf of the government alleging that a third party made a fraudulent claim for payment to the government. *Id.* § 3730(b)(1). These suits are known as "*qui tam*" suits, and the individual plaintiffs are called "relators." Recognizing the risks relators face as prospective whistleblowers, the Act prohibits employers from retaliating against employees who try to stop violations of the Act. *Id.* § 3730(h).

Julie Reed sued her former employer, KeyPoint Government Solutions, LLC ("KeyPoint"), for violating the False Claims Act. Her *qui tam* claims alleged that KeyPoint violated the Act by knowingly and fraudulently billing the government for work that was inadequately or improperly completed. Ms. Reed also claimed that KeyPoint fired her in retaliation for her efforts to stop KeyPoint's fraud.

This case presents two overarching questions. First, did the district court err in granting summary judgment in KeyPoint's favor on Ms. Reed's *qui tam* claims? Second, did the district court err in dismissing Ms. Reed's

2

retaliation claim under Federal Rule of Civil Procedure ("Rule") 12(b)(6)?

Exercising jurisdiction under 28 U.S.C. § 1291, we hold that the district court erred in the first respect but not in the second. We therefore **vacate** the district court's order insofar as it granted summary judgment on Ms. Reed's *qui tam* claims and **remand** for further proceedings. We **affirm** the district court's order insofar as it dismissed Ms. Reed's retaliation claim.

## I

This is a whistleblower case. The relevant background has three parts: (1) the statutory background, (2) the underlying (alleged) bad acts, and (3) the whistleblowing and ensuing procedural history. We recount each part below.

### A

The False Claims Act "covers all fraudulent attempts to cause the government to pay out sums of money." *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir. 2008) (quoting *United States ex rel. Boothe v. Sun Healthcare Grp., Inc.*, 496 F.3d 1169, 1172 (10th Cir. 2007)). It does so by permitting the recovery of civil penalties and treble damages from anyone who "knowingly presents . . . a false or fraudulent claim for payment or approval." 31 U.S.C.

3

§ 3729(a)(1)(A). Liability also attaches to anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(1)(B).

The Act's proscriptions may be effectuated in two ways. "First, the Government itself may" sue "the alleged false claimant" to remedy the fraud. *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 769 (2000). Second, "a private person (the relator) may bring a *qui tam*" suit on behalf of the government and also for herself alleging that a third party made fraudulent claims for payment to the government. *Id.* "As a bounty for identifying and prosecuting fraud," relators get to keep a portion "of any recovery they obtain." *Boothe*, 496 F.3d at 1172 (citing 31 U.S.C. § 3730(d)).

But there are limits to a relator's right to bring a *qui tam* suit. One such limit is "known as the public disclosure bar." *Id.*; *see State Farm Fire & Cas. Co. v. United States ex rel. Rigsby*, 580 U.S. ----, 137 S. Ct. 436, 440 (2016) (describing the public disclosure bar as a threshold relators must pass for their *qui tam* suits to proceed). That bar compels courts to dismiss *qui tam* claims "if substantially the same allegations . . . as alleged in the action or claim were publicly disclosed," unless the relator "is an original

4

source of the information."[1]  31 U.S.C. § 3730(e)(4)(A).  The public

[1]     Before Congress amended the False Claims Act in 2010, the public disclosure bar was jurisdictional—that is, if the bar applied, courts lacked subject-matter jurisdiction.  *See Boothe*, 496 F.3d at 1177 (explaining that, as of 2007, the public disclosure bar was jurisdictional).  The pre-2010 provision read:  "No court shall have jurisdiction over" a *qui tam* action "based upon the public disclosure of allegations."  31 U.S.C. § 3730(e)(4)(A) (2006).  The 2010 amendments removed the reference to jurisdiction, counseling district courts instead to "dismiss an action" if the public disclosure bar applies.  31 U.S.C. § 3730(e)(4)(A) (2010).  The federal courts of appeals that have confronted the issue have unanimously held that the 2010 "amendments transformed the public disclosure bar from a jurisdictional bar to an affirmative defense." *United States ex rel. Prather v. AT&T, Inc.*, 847 F.3d 1097, 1102 (9th Cir.), *cert denied*, 137 S. Ct. 2309 (2017); *see also United States ex rel. Beauchamp v. Academi Training Ctr.*, 816 F.3d 37, 40 (4th Cir. 2016) (holding the amended "public-disclosure bar is . . . an affirmative defense," not "a jurisdictional bar"); *United States ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 300 (3d Cir. 2016) (same); *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 810 (11th Cir. 2015) (same).

Our circuit has yet to opine on this issue.  And we need not do so today.  Let us briefly explain the most salient reasons.  KeyPoint properly raised the public disclosure bar as a defense in its motion to dismiss before the district court.  As a result, we need not determine the jurisdictional status of the public disclosure bar here.  If KeyPoint had failed to raise the bar before the district court and had asserted it for the first time on appeal, we would have been obliged to consider the issue only if it was jurisdictional—that is, if it implicated our jurisdiction to hear the merits of Ms. Reed's *qui tam* claims—not if it was merely an affirmative defense.  Therefore, under such hypothetical circumstances, the jurisdictional status of the issue would have been an important question that we needed to resolve.  *See Smith v. Cheyenne Ret. Inv'rs L.P.*, 904 F.3d 1159, 1164 (10th Cir. 2018) (noting that "[i]n most cases, including this one, this distinction between a jurisdictional requirement and an affirmative defense is immaterial" because the party has "pled failure to exhaust as an affirmative defense"); *McQueen ex rel. McQueen v. Colo. Springs Sch. Dist.*, 488 F.3d 868, 873 (10th Cir. 2007) (explaining that the distinction between an affirmative defense and a jurisdictional prerequisite "is important . . . only when the defendant has waived or forfeited the issue" but because "there is no question of waiver or forfeiture" the court "need not decide whether exhaustion is jurisdictional"); *accord Coleman v. Newburgh Enlarged City Sch. Dist.*, 503 F.3d 198, 204 (2d Cir. 2007) ("[W]e are not forced to decide whether our precedent, which labels the IDEA's exhaustion requirement as a rule affecting subject

(continued...)

5

disclosure bar aims to strike "the golden mean between" encouraging

"whistle-blowing insiders with genuinely valuable information" to come

forward while discouraging "opportunistic plaintiffs who have no

significant information to contribute of their own." *United States ex rel.*

*Fine v. Sandia Corp.*, 70 F.3d 568, 571 (10th Cir. 1995) (quoting *United*

*States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 649 (D.C.

Cir. 1994)).

---

[1](...continued)
matter jurisdiction rather than an 'inflexible claim-processing' rule that may be waived or forfeited, remains good law . . . because there can be no claim of waiver or forfeiture here."); *see also Davoll v. Webb*, 194 F.3d 1116, 1128 (10th Cir. 1999) ("If [an] issue implicates subject matter jurisdiction, we have an obligation to address it 'regardless of normal rules governing the presentation of issues.'" (quoting *Int'l Union of Operating Eng'rs, Local 150 v. Rabine*, 161 F.3d 427, 429 (7th Cir. 1998))). But those hypothetical circumstances are not present here; therefore, we need not consider the jurisdictional status of the public disclosure bar. Furthermore, as we explain later, we conclude that the original-source analysis that the district court used in concluding that the public disclosure bar precludes Ms. Reed's *qui tam* claims is legally flawed. Accordingly, we vacate its judgment and remand for further proceedings. As a product of that disposition, Ms. Reed's *qui tam* claims are not (at least for the time being) subject to the public disclosure bar. Thus, also for this reason, whether that bar is jurisdictional or not is immaterial. Finally, we observe that the parties did not meaningfully address the public disclosure bar's proper characterization—i.e., jurisdictional or an affirmative defense. Although this failure would not obviate the need for us to independently consider that question if our jurisdiction over the merits depended on the answer, the parties' underdeveloped arguments on this score further militate against us trying to answer the question when the answer is *not* material here, let alone determinative of our jurisdiction. *Cf. Hill v. Kemp*, 478 F.3d 1236, 1251 (10th Cir. 2007) ("Our system of justice, after all, is not a self-directed inquisitorial one; to avoid error, we are dependent on the full development of issues through the adversarial process . . . .").

And because insiders might be reluctant to use these *qui tam* provisions due to fear of employer backlash, the False Claims Act protects whistleblowers from employer retaliation. *See Potts v. Ctr. for Excellence in Higher Educ., Inc.*, 908 F.3d 610, 613–14 (10th Cir. 2018) (discussing 31 U.S.C. § 3730(h)). To qualify for whistleblower protection, an employee must engage in "protected activity." *Armstrong v. Arcanum Grp., Inc.*, 897 F.3d 1283, 1286 (10th Cir. 2018). Until 2009, protected activity included only "lawful acts done by the employee . . . in furtherance of an action under this section [i.e., a *qui tam* suit]." 31 U.S.C. § 3730(h) (2008). But Congress amended the anti-retaliation provision in 2009 and 2010, and it now protects employees who take steps "in furtherance of" either a *qui tam* claim *or* "other efforts to stop 1 or more violations" of the Act. 31 U.S.C. § 3730(h)(1). A whistleblower who prevails on her retaliation claim is entitled to reinstatement, double back pay, litigation costs, and attorneys' fees. *Id.* § 3730(h)(2). The events giving rise to this litigation took place against this statutory backdrop.

**B**

**1**

KeyPoint is a private company that conducts background investigations for the federal government—specifically, the Office of

7

Personnel Management ("OPM"). OPM uses KeyPoint to investigate prospective federal employees. The depth of KeyPoint's investigations varies according to the level of security clearance involved. Most investigations, though, entail running background checks, interviewing the subject of the investigation, gathering testimony from the subject's neighbors and coworkers, and then compiling the information in a report. Government agencies rely on these reports in making employment decisions and deciding whether to issue (or reject) security clearances.

OPM's contract with KeyPoint rewards timeliness. If KeyPoint finishes its investigations on time, OPM pays KeyPoint a premium. But KeyPoint's pay decreases for each day an investigation runs past the deadline.

The contract also includes safeguards to ensure that KeyPoint's investigations are complete and accurate. For example, KeyPoint must do thorough case reviews of each investigation and reinterview a percentage of all sources. Another safeguard is the Telephone Testimony Program ("TTP"); KeyPoint developed such a program at OPM's request, and OPM endorsed KeyPoint's program. Ordinarily, investigators must conduct in-person interviews. But they may do telephone interviews under some circumstances, so long as they keep their total number of telephone

interviews below a certain percentage threshold. Under the TTP, each month OPM sends KeyPoint a list of investigators who exceeded their allotted number of telephone interviews during the last month. KeyPoint then must send OPM "corrective action report[s]" explaining each infraction and what it is doing to remedy the problem. Aplt.'s App. at 31, ¶ 54 (Second Am. Compl., filed Dec. 5, 2016). The contract and OPM's Investigator's Handbook, which the contract incorporates, spell out these and other quality-control measures.

**2**

Along with KeyPoint, the background-investigation industry has two other main players—U.S. Investigations Services ("USIS") and CACI International, Inc. ("CACI"). This insular industry has had its share of troubles. From 2008 to 2010, the government prosecuted several individual investigators, including a former KeyPoint employee, for rushing investigations and falsifying information in reports to OPM. And a 2010 report summarizing an OPM audit concluded that KeyPoint's and its competitors' "quality assurance process" needed improvement. *Id*. at 273 (Final Audit Report, dated June 22, 2010).

The year 2013 was a particularly turbulent one for the industry. That year two federal government contractors—Edward Snowden and Aaron

Alexis—committed high-profile crimes after having received security clearances. These embarrassing episodes put the industry under intense scrutiny.

With scrutiny came unflattering news reports. A June 2013 article reporting on allegations against USIS noted that the "concerns about background checks [were] not limited to USIS" and later named KeyPoint and CACI as USIS's "two main competitors." *Id.* at 159, 160 (Wash. Post Article, dated June 27, 2013). Another article that month reported that "a select group of private contractors conducting background checks for high-security jobs were not doing enough to ensure the quality of their investigations." *Id.* at 302 (Reuters Article, dated June 26, 2013). The article noted "problems with procedures and safeguards used by all three private contractors—USIS, KeyPoint . . . and CACI." *Id.* at 303. A slew of other news reports covered such allegations roiling the background-investigation industry.

The allegations in the press worried Congress and OPM. Those worries led to several congressional hearings to probe the industry's alleged practice of using "false, incomplete, or rushed information gathering" in its background investigations. *Id.* at 411 & n.3 (Order, entered Sept. 28, 2017). And the bad press of its contractors prompted OPM to commission

10

an audit of KeyPoint's and its competitors' practices. The audit concluded that "OPM need[ed] to strengthen its controls over its Contractors and the background investigation review process." *Id.* at 164 (Audit Report, dated June 4, 2014).[2]

Exacerbating the industry's woes, a federal court unsealed a complaint against USIS in October 2013. *See United States ex rel. Percival v. U.S. Investigations Servs., LLC*, No. 2:11-cv-00527-WKW-WC (M.D. Ala. July 1, 2011) (complaint reproduced in Aplt.'s Reply Br., Addendum A). That complaint leveled three accusations against USIS: first, that USIS "failed to provide accurate and complete investigations prior to Cases being submitted to the government," Aplt.'s Reply Br., Addendum A, at 10; second, that USIS "knowingly submitted Cases to OPM for payment that [it] knew had not been reviewed," *id.* at 6; and third, that USIS exploited "the Blue Zone software . . . . to submit Cases to OPM under the false pretense that the Cases had been complete[d] and accurately and properly reviewed," *id.* at 12. This USIS suit and the government's intervention into it incited

---

[2] The copy of the audit report included in the record is undated. But a copy of the report that is publicly available via the Internet lists the date the report was published as June 4, 2014. *See* OFFICE OF PERS. MGMT., AUDIT OF THE FEDERAL INVESTIGATIVE SERVICES' CASE REVIEW PROCESS OVER BACKGROUND INVESTIGATIONS (2014), https://www.opm.gov/our-inspector-general/publications/reports/2014/audit-of-the-federal-investigative-services-case-review-process-over-background-investigations.pdf.

more press accounts of the industry's shoddy investigations.

**3**

Ms. Reed worked for KeyPoint during this turbulent period. As a Senior Quality Control Analyst, she reviewed investigators' work and documented incomplete investigations in monthly reports. Ms. Reed also ran KeyPoint's TTP by performing a "regular monthly audit of KeyPoint investigators who violated" the program. Aplt.'s App. at 34, ¶ 81. Along with her "regular duties," Ms. Reed "was occasionally tasked with extra audits of investigators," *id.* at 61, ¶ 165, or assigned "to determine the nature of . . . chronic infractions," *id.* at 84, ¶ 228. The precise scope of Ms. Reed's responsibilities as a Senior Quality Control Analyst and where she fell in the KeyPoint hierarchy, however, are not specified in the operative complaint.

Nevertheless, that complaint does clearly aver that, in discharging her duties, Ms. Reed observed what she described as "KeyPoint's systemic violations" of its contract with OPM and persistent submission of fraudulent claims for payment to the government based on incomplete or improperly completed investigations. *Id.* at 29, ¶ 34. Ms. Reed's position allowed her to see investigators falsely reporting applicants' backgrounds as "clean" and omitting information showing otherwise, completing fewer

12

than the required number of interviews, and generally cutting corners. Ms. Reed also believed that she witnessed rampant violations of the TTP and a scheme by KeyPoint management to hide the violations by submitting knowingly false corrective action reports to OPM.

According to Ms. Reed, KeyPoint's management not only knew of the foregoing systemic violations but also encouraged them by pressuring investigators to rush investigations to maximize revenue. Alarmed by the abuses, Ms. Reed voiced her concerns within the company. Periodically, Ms. Reed and her staff uncovered and reported violations. Ms. Reed also "regularly reported [certain] infractions to her supervisor . . . by submitting and discussing a monthly spreadsheet." *Id.* at 62, ¶ 171. Along with these monthly reports, Ms. Reed repeatedly shared her concerns with her supervisor. She also discussed the problems with other individuals at KeyPoint, such as the Director of Training, the OPM Contract Director, Regional Managers, and certain Field Managers. But Ms. Reed's efforts to curb the violations failed. In fact, she alleges that the problems multiplied over time.

Eventually, KeyPoint fired Ms. Reed in October 2013. About a month later, Ms. Reed and her counsel contacted the Department of Justice ("DOJ"). She told DOJ about the abuses she claimed to have witnessed

while at KeyPoint.  To back up her allegations, Ms. Reed provided a pre-disclosure statement and a presentation detailing KeyPoint's alleged violations.

## C

At the government's urging, Ms. Reed sued KeyPoint in January 2014. Her operative complaint raised three *qui tam* claims and a retaliation claim.[3]  The *qui tam* claims alleged that KeyPoint violated the False Claims Act by: (1) falsely certifying that it performed complete and accurate investigations, (2) falsely certifying that it did proper case reviews and quality-control checks, and (3) falsifying corrective action reports.  Ms. Reed's retaliation claim alleged that KeyPoint fired her for trying to stop it from violating the False Claims Act.

After the government declined to intervene in the case, KeyPoint moved to dismiss the suit.  The district court then informed the parties that it intended to convert the portion of KeyPoint's motion concerning the *qui tam* claims into a summary-judgment motion; the court did not perform a similar conversion on KeyPoint's motion to dismiss the retaliation claim.

---

[3]     Ms. Reed also alleged that KeyPoint violated the Americans with Disabilities Act by retaliating against her because of her disability.  The district court granted KeyPoint's motion to dismiss that claim.  Ms. Reed does not challenge that ruling on appeal.

14

At the court's invitation, Ms. Reed filed additional evidence to defend her *qui tam* claims from summary judgment.

In September 2017, the district court entered judgment for KeyPoint on all counts. Regarding the *qui tam* claims, the court declined to consider some of the supplemental materials that Ms. Reed had proffered to oppose KeyPoint's summary-judgment motion. And, on the merits, the court determined that the allegations in Ms. Reed's *qui tam* claims were "substantially the same" as those that had been publicly disclosed in (1) the criminal investigations of individual investigators, (2) the unflattering news reports about the background-investigation industry, (3) the congressional hearings and OPM audits, and (4) the USIS suit. *Id.* at 411. And, because the court also concluded that Ms. Reed did not qualify as "an 'original source,'" it dismissed her *qui tam* claims under the public disclosure bar. *Id.* at 414. As for Ms. Reed's retaliation claim, the district court granted KeyPoint's Rule 12(b)(6) motion to dismiss after determining that she had inadequately pleaded that KeyPoint was on notice that she was engaging in protected activity.

Ms. Reed now appeals from the district court's order entering judgment for KeyPoint. Her appeal presents two questions. First, did the district court err in granting KeyPoint summary judgment on the *qui tam*

claims under the public disclosure bar?  And second, did the district court err in granting KeyPoint's Rule 12(b)(6) motion to dismiss the retaliation claim?  For the reasons explicated below, we answer the first question in the affirmative and the second in the negative.

## II

We start with the first question.  The public disclosure bar compels courts to dismiss *qui tam* claims if (1) "substantially the same allegations . . . were publicly disclosed," *unless* (2) the relator is "an original source of the information."  31 U.S.C. § 3730(e)(4)(A).  The district court thought the allegations in Ms. Reed's *qui tam* claims were substantially the same as those that had been publicly disclosed.  And it further reasoned that Ms. Reed was not an original source of that information.  Thus, the district court granted KeyPoint summary judgment on Ms. Reed's *qui tam* claims.

We review that conclusion de novo and apply the same legal standard that the district court used.  *See United States ex rel. Smith v. Boeing Co.*, 825 F.3d 1138, 1145 (10th Cir. 2016).  "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Id.* (quoting FED. R. CIV. P. 56(a)).  When, as here, the district court granted the defendant's motion for summary judgment, "we accept as true the

16

relator['s] evidence and draw all reasonable inferences in [her] favor." *Id.*

Ms. Reed argues that the district court erred twice en route to dismissing her *qui tam* claims under the public disclosure bar.[4] Its first error, she says, was concluding that the allegations in her complaint were substantially the same as those aired in earlier public disclosures. Compounding that error, in her view, the district court then wrongly determined that she did not fall under the "original source" exception to the public disclosure bar.

Put differently, the fate of Ms. Reed's *qui tam* claims hangs on two questions. First, are the allegations in those claims substantially the same as those in earlier public disclosures? And second, if so, is Ms. Reed an "original source" of the information in her claims? Our answer to the first question does not favor Ms. Reed, but our answer to the second one does.[5]

---

[4] For the public disclosure bar to apply, two other conditions must be met. First, "the alleged 'public disclosure'" must "contain[] allegations . . . from one of the listed sources" in the Act. *In re Nat. Gas Royalties*, 562 F.3d 1032, 1039 (10th Cir. 2009) (quoting *United States ex rel. Holmes v. Consumer Ins. Grp.*, 318 F.3d 1199, 1203 (10th Cir. 2003)); *see* 31 U.S.C. § 3730(e)(4)(A)(i)–(iii) (listing, among other things, news reports, congressional hearings, prior lawsuits, and federal audits as "sources"). Second, the disclosure must be "public." *See In re Nat. Gas Royalties*, 562 F.3d at 1039. Because the parties agree that these conditions are met, we need not (and do not) consider them.

[5] We typically answer "only the questions we must, not those we can." *Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1094 (10th Cir. 2010). Thus, we pause to explain our rationale for resolving the substantially-the-same question even though we ultimately vacate the district court's judgment regarding

(continued...)

17

the *qui tam* claims because of its error in resolving the original-source question. In other words, because the original-source error is ultimately determinative here in our resolution of the public-disclosure-bar issue, some might question the need to first rule on the substantially-the-same component of the public-disclosure-bar issue. But our precedent teaches that application of the public disclosure bar "requires a four-step inquiry." *Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1042 (10th Cir. 2004). The first two steps—which are not at issue here—relate to whether the information in question qualifies under the Act as a public disclosure. *See id.* The third step is the substantially-the-same inquiry. These first three steps determine whether, absent an exception, the public disclosure bar applies at all. *See id.* And so our circuit has counseled courts to "address the first three public disclosure issues first." *Id.* (quoting *United States ex rel. Hafter v. Spectrum Emergency Care*, 190 F.3d 1156, 1161 (10th Cir. 1999)). Reaching "the fourth, 'original source' issue is necessary *only if* the court answers the first three questions in the affirmative." *Id.* (emphasis added) (quoting *Hafter*, 190 F.3d at 1161). In *Kennard*, for example, we first concluded that the public disclosure bar's three prerequisites applied. *Id.* Then we held that the relators "qualif[ied] as an original source," thus reversing the district court's order. *Id.* at 1046.

Admittedly, this precedent instructing courts to reach the original-source question only after answering in the affirmative the substantially-the-same question interpreted the pre-2010 version of the public disclosure bar, which was jurisdictional. That said, we see no reason why the 2010 amendment—irrespective of its jurisdictional import—should change our view that the substantially-the-same "analysis is a threshold inquiry" that we should resolve before "reach[ing] the 'original source' analysis." *United States ex rel. Fine v. MK-Ferguson Co.*, 99 F.3d 1538, 1545 (10th Cir. 1996) (quoting *United States ex rel. Precision Co. v. Koch Indus., Inc.*, 971 F.2d 548, 552 (10th Cir. 1992)). After all, as we explain below, the 2010 amendment establishes an analytical rubric consistent with our pre-2010 precedent. Moreover, the structure of the amended provision—like the unamended version—supports the proposition that the substantially-the-same inquiry is a threshold one. That provision instructs courts to dismiss a *qui tam* claim "if substantially the same allegations . . . were publicly disclosed . . . . *unless* . . . the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A) (2010) (emphasis added); *see Moore*, 812 F.3d at 297–98 (quoting this amended language and concluding that a relator's allegations were substantially the same as those in the public sphere, "but that [the relator] was nevertheless an original source"). Thus, we adhere to our pre-2010-amendment view that courts should resolve the substantially-the-same question before considering whether a relator's *qui tam* claims may proceed under the

(continued...)

18

Specifically, we hold that Ms. Reed's complaint averments are substantially the same as the allegations in the available public disclosures, but the district court erred in finding that Ms. Reed's averments do not materially add to those disclosures' allegations, such that she does not qualify as an original source. But this holding does not fully resolve the original-source question. Consequently, we vacate the district court's summary-judgment order and remand for further proceedings regarding whether Ms. Reed qualifies as an original source.

**A**

We agree with the district court that Ms. Reed's allegations undergirding her *qui tam* claims are "substantially the same" as the allegations in the public disclosures. We explain this conclusion in three steps. First, we discuss the applicable legal standard that guides our substantially-the-same inquiry. Second, we compare the allegations in Ms. Reed's *qui tam* claims with those in the public disclosures. And third, we close by concluding that the allegations in the *qui tam* claims are "substantially the same" as the publicly disclosed allegations.

---

[5](...continued)
original-source exception.

**1**

Congress amended the False Claims Act in 2010. *See* Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119, 901–02 ("2010 amendment"). Before that year, the provision setting out the public disclosure bar read: "No court shall have jurisdiction over an action under this section *based upon* the public disclosure of allegations or transactions . . . ." 31 U.S.C. § 3730(e)(4)(A) (2008) (emphasis added). The amended provision reads: "The court shall dismiss an action . . . if *substantially the same* allegations . . . as alleged in the action or claim were publicly disclosed." 31 U.S.C. § 3730(e)(4)(A) (2010) (emphasis added).

Our court has yet to opine on the degree of similarity necessary to satisfy this new substantially-the-same standard. That said, even before 2010, our circuit read the unamended provision's "based upon" language to mean that the public disclosure bar applied when "the allegations in the complaint were substantially the same as allegations in the public disclosures." *Fine*, 70 F.3d at 572; *see also Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 910 (7th Cir. 2009) (noting that "eight other circuits have read the phrase 'based upon'" to encompass allegations that are "substantially similar" to those publicly disclosed). That the substantially-the-same standard adopted in the 2010 amendment resembles

20

the standard we already used is no accident; the amendment "expressly incorporates the 'substantially similar' standard in accordance with the interpretation of this circuit and most other circuits." *Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 718 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 1284 (2018).  Thus, the 2010 amendment confirms the vitality of our pre-2010 standard.[6]

In her reply brief, Ms. Reed argues for the first time that the 2010 amendment nullifies our earlier cases. *See* Aplt.'s Reply Br. at 8.  In her view, the amendment "made clear" Congress's "desire to narrow the impact of the public disclosure bar." *Id.*  Indeed, Ms. Reed believes that Congress acted specifically to jettison the reasoning used in our pre-2010 cases.  And so she warns us not to rely on those earlier cases in our substantially-the-same inquiry.

Ms. Reed's argument is too little too late.  For starters, by waiting

---

[6] *Accord United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 208 n.4 (1st Cir. 2016) ("The revised statutory langauge—'substantially the same'—merely confirms our earlier understanding."); *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 569 n.7 (9th Cir. 2016) ("[O]ur analysis of the issue of substantial similarity would be the same under either version [of the public-disclosure-bar provision]."); *Cause of Action v. Chi. Transit Auth.*, 815 F.3d 267, 281 n.20 (7th Cir. 2016) ("Our analysis [of substantial similarity] is therefore the same under either version of the statute."); *see also United States ex rel. Armes v. Garman*, 719 F. App'x 459, 463 n.2 (6th Cir. 2017) (unpublished) ("[T]he 2010 amendment does not affect our public-disclosure analysis . . . .").

until her reply brief to argue that the 2010 amendment narrowed the public disclosure bar's sweep and undermined our earlier cases, Ms. Reed waived that argument. *See, e.g.*, *White v. Chafin*, 862 F.3d 1065, 1067 (10th Cir. 2017) ("Mr. White waived this contention by waiting to present it for the first time in his reply brief."). Furthermore, were we to overlook this waiver, we nevertheless would decline Ms. Reed's invitation to discard our earlier precedent because of Congress's supposed "desire to narrow the impact of the public disclosure bar." Aplt.'s Reply Br. at 8.

We ordinarily derive Congress's intent "from the text, not from extrinsic sources." Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 56 (2012). The amended text says that the public disclosure bar applies when substantially the same allegations had been publicly disclosed; that is how our circuit (and most others) applied the public disclosure bar pre-amendment, *see Fine*, 70 F.3d at 572, and that is how we will continue to apply it until Congress or the Supreme Court tells us otherwise. In any event, Congress's supposed desire to narrow the public disclosure bar presumably would relate to only those circuits that had used a standard other than the substantially-the-same standard adopted in the 2010 amendment. *See, e.g.*, *United States ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 917 (4th Cir. 2013) (explaining

22

that because the Fourth Circuit had not used the substantially-the-same standard, the 2010 amendment "changed the required connection between the plaintiff's claims and the qualifying public disclosure" in that circuit). But in this circuit—where we already used the substantially-the-same standard—the 2010 amendment "merely confirms our earlier understanding." *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 208 n.4 (1st Cir. 2016). Thus, our pre-2010-amendment cases guide our substantially-the-same inquiry.

Those cases teach that the operative question is whether the public disclosures were sufficient to set the government "on the trail of the alleged fraud without [the relator's] assistance."[7] *Fine*, 70 F.3d at 571. And we must recognize that the government's nose for fraud may be sensitive enough to pick up the scent even if the public disclosures did not "identify

---

[7] We are aware of scholarly criticism of the on-the-trail-of-fraud standard. *See* Susan Schneider Thomas & Jonathan Z. DeSantis, *Misguided Meanders: The "Trail of Fraud" Under the Public Disclosure Bar of the False Claims Act*, 43 UNIV. OF DAYTON L. REV. 161, 182 (2018) ("[R]ather than using the innately ambiguous assessment of whether the alleged public disclosures '*might have*' '*set*' the government on the '*trail*' of fraud, it would be a far more meaningful analysis to examine, as the plain language of the statue commands, whether the potentially disabling public disclosures in fact disclosed allegations or transactions of fraud, or made actual allegations of fraudulent conduct."). However, *Fine* and its progeny are binding precedent in this circuit. Moreover, Ms. Reed does not challenge the propriety of this standard in her Opening Brief.

any specific compan[y]."[8] *See In re Nat. Gas Royalties*, 562 F.3d 1032, 1039, 1042 (10th Cir. 2009). The need to identify the defendant by name is particularly weak when "the government has already identified the problem and has an easily identifiable group of probable offenders."[9] *Fine*, 70 F.3d at 572. Similarly, "[a] relator need not have learned of the basis for the *qui tam* action from the public disclosure" to trigger the public disclosure bar. *Kennard v. Comstock Res., Inc.*, 363 F.3d 1039, 1044 (10th Cir. 2004). Nor is "a *complete* identity of allegations, even as to time, place, and manner . . . required to implicate the public disclosure bar." *Boothe*, 496 F.3d at 1174. Rather, it is enough if "the essence of" the relator's allegations was "'derived from' a prior public disclosure." *Id.* In fact, the public

---

[8]     *See also United States ex rel. Lager v. CSL Behring, L.L.C.*, 855 F.3d 935, 946 (8th Cir. 2017) (concluding that the disclosures "'set the government squarely on the trail' of the defendants'" fraud even though the disclosures did not name defendants (quoting *In re Nat. Gas Royalties*, 562 F.3d at 1041)); *United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 238 (3d Cir. 2013) (concluding allegations were substantially similar even though defendants "were not actually identified" in the public disclosure).

[9]     *See also Lager*, 855 F.3d at 946 (finding substantial similarity when disclosures gave enough information about an industry-scheme to "identify the defendants" without naming them); *cf. United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 329, 330 (5th Cir. 2011) (observing that "the public disclosures need not name particular defendants so long as they 'alerted the government to the industry-wide nature of the fraud and enabled the government to readily identify wrongdoers through an investigation," but reasoning that "the defendants' documents, considered alone, likely are not sufficient publically to disclose allegations specific to" them because their industries "are large" and "[t]he public disclosures do not indicate that fraud is universal or even widespread within them" (quoting *In re Nat. Gas Royalties*, 562 F.3d at 1039)).

24

disclosures need not allege any False Claims Act violations or even "any wrongdoing"; they need only disclose "the material elements of the fraudulent transaction."[10]  *Fine*, 70 F.3d at 572.

In summary, the public disclosure bar applies to *qui tam* claims "if substantially the same allegations . . . were publicly disclosed."  31 U.S.C. § 3730(e)(4)(A).  Our pre-2010-amendment cases primarily guide our substantially-the-same inquiry.  And those cases teach that the operative question is whether the public disclosures were sufficient to set the government "on the trail of the alleged fraud without [the relator's] assistance."  *Fine*, 70 F.3d at 571.

**2**

Having settled on the proper standard governing the substantially-the-same inquiry, we now must compare Ms. Reed's allegations with those in the public disclosures.

***Ms. Reed's Allegations***.  At a high level of generality, Ms. Reed's *qui tam* claims allege that KeyPoint "was engaging in systemic fraud."  Aplt.'s

---

[10]     *See also Bellevue*, 867 F.3d at 718–19 (noting that the substantially-the-same standard requires only "that the government had enough information" from the public disclosures to infer that the defendant knowingly violated the False Claims Act); *Winkelman*, 827 F.3d at 208 (explaining that it is enough that the public disclosures "lead to a plausible inference of fraud" (quoting *United States ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 54 (1st Cir. 2009))); *Osheroff*, 776 F.3d at 814 (same).

Opening Br. at 1.  This fraud grew from KeyPoint's "focus[] on meeting . . . deadlines" and winning bonuses "at the expense of the quality, completeness, and accuracy" of its investigations, Ms. Reed says.  Aplt.'s App. at 29, ¶ 38.  For instance, Ms. Reed accuses KeyPoint of pressuring investigators to rush investigations to maximize revenue.  This pressure led, generally, to rampant violations of KeyPoint's contract with OPM and, in particular, of the TTP.  Notably, as to the TTP, the pressure led to the submission of knowingly false corrective action reports designed to hide the violations.  At bottom, Ms. Reed alleges that KeyPoint knowingly defrauded the government to "enrich itself and its executives at the expense of national security."  Aplt.'s Opening Br. at 6.

Zooming in on the details, Ms. Reed claims that KeyPoint's fraud manifested itself in three main ways.  First, she says that KeyPoint falsely certified to OPM that it had performed complete and accurate investigations.  To support this charge, Ms. Reed points to specific instances in which investigators failed to do mandatory interviews of sources.  She also details how individual investigators uncovered derogatory information about subjects but failed to report that information in their reports to OPM.  Piling on, Ms. Reed lists over 100 instances in which investigators cut interviews short and then lied about it to OPM.  She

26

adds to this by exposing scores of violations of the TTP.

Ms. Reed contends that the second manifestation of KeyPoint's fraud entailed falsely representing to OPM that it had done proper case reviews and quality-control checks. For instance, she documents at least five times that, "despite . . . readily apparent violations," KeyPoint reviewers violated OPM requirements by failing to reopen cases. Aplt.'s App. at 88, ¶ 248. And to circumvent the TTP, "quality control staff failed to perform the proper number of re-interviews." *Id.* at 89, ¶ 252.

The third (related) strain of fraud Ms. Reed identifies is KeyPoint's submission of falsified corrective action reports. Recall that these reports "are supposed to detail the specific actions taken by KeyPoint management to address" violations of OPM rules and programs—most notably, the TTP. *Id.* at 89, ¶ 255. To hide its rampant violations and institutional acquiescence to those violations, Ms. Reed alleges that "KeyPoint falsified corrective action reports to OPM" to give the appearance that it "was actively addressing [violations], when it was not." *Id.* at 89, ¶ 256. To Ms. Reed's knowledge, KeyPoint falsified dozens of reports to hide malfeasance by at least four individual investigators.

***Publicly Disclosed Allegations***. There are four categories of relevant public disclosures: (1) criminal investigations of individual investigators,

27

(2) the news reports, (3) congressional hearings and OPM audits, and (4) the previously mentioned USIS suit.

*Criminal Investigations*.  Between 2007 and 2013, the government prosecuted individual investigators for allegedly falsifying information in their reports.  At least one of these "criminal cases involve[d] . . . a former Key[P]oint employee who 'raced through investigations to get more work' and lied about conducting thorough background checks when they were incomplete and rushed."  *Id.* at 410.

*News Reports*.  In 2013, a slew of news reports chronicled the suspected fraud and widespread sloppiness in the background-investigation industry.  One article in September 2013 reported that the government was "'pursuing suspected fraud in the granting of security clearances,' including '19 private and government investigators for submitting fabricated reports.'"  *Id.* (quoting *id.* at 307–09 (NBC Article, dated Sept. 18, 2013)).  Another article in June 2013 relayed that OPM had found problems "with procedures and safeguards used by all three private contractors—USIS, KeyPoint . . . and CACI."  *Id.* at 303.  This article added that "[a]ll three companies have had investigators who were found to have done substandard work in background checks."  *Id.*  Another June 2013 article reporting on allegations against USIS noted that "concerns about background checks

28

[were] not limited to USIS." *Id.* at 159.

***Congressional Hearings & OPM Audits***. In 2013, Congress twice held hearings to investigate the background-investigation industry's practice of using "false, incomplete, or rushed information gathering" in its background investigations. *Id.* at 411 & n.3. OPM reacted by commissioning an audit of KeyPoint's and its competitors' practices. This audit determined that OPM "need[ed] to strengthen its controls over its Contractors and the background investigation review process." *Id.* at 164. Back in 2010, OPM had completed a report on another audit of the background-investigation industry. This earlier report concluded that KeyPoint's and its competitors' "quality assurance process" needed improvement. *Id.* at 273. The 2010 report also revealed that KeyPoint sometimes "did not conduct the required amount of re-contacts" in its investigations, *id.* at 289, and that there were "falsification and[] integrity issues" with investigations done by USIS, KeyPoint, and CACI, *id.* at 261.

***The USIS Suit***. In October 2013—a month before Ms. Reed conveyed her allegations to DOJ and two months before she filed her *qui tam* suit—a federal court unsealed a complaint against USIS. The complaint included three *qui tam* claims against USIS. First, it alleged that USIS had a practice of "dumping" cases. That is, USIS allegedly sent cases "to OPM

29

that were represented as Field Finished" when, in truth, they were unreviewed or "had not been investigated at all." Aplt.'s Reply Br., Addendum A, at 5. Second, the complaint claimed that USIS "failed to provide accurate and complete investigations." *Id.* at 10. Third, USIS supposedly falsely represented to OPM the extent to which it used a software program known as the "Blue Zone." *Id.* at 12. But the suit neither mentioned KeyPoint nor implied that USIS's fraud extended to its competitors or the industry as a whole.

**3**

The question now is: Are the allegations in Ms. Reed's *qui tam* claims substantially the same as those in the publicly disclosed sources? We agree with the district court that the answer to that question is "yes." That is, we conclude that the public disclosures were sufficient to set the government on the trail of KeyPoint's alleged fraud without Ms. Reed's assistance.[11]

---

[11] Ms. Reed alleges on appeal that the district court "fail[ed] to do a diligent comparison of the putative public disclosures with [her] allegations." Aplt.'s Opening Br. at 3. Not so. Beyond incorporating the magistrate judge's discussion of the relevant allegations, *see* Aplt.'s App. at 409, the district court dutifully recounted Ms. Reed's allegations and the publicly disclosed allegations in turn, *see id.* at 408–12. From this comparison, the court then concluded that Ms. Reed's allegations were substantially similar to the publicly disclosed allegations. The sufficiency of this analysis cannot be questioned. In any event, our review is de novo, and we have thoroughly compared the

(continued...)

30

At their most general, Ms. Reed's *qui tam* claims allege systemic sloppiness and fraud in the background-investigation *industry*.[12]  But the government and the public knew that much already from the news reports. Those news articles painted a picture of widespread problems with the thoroughness and accuracy of the private contractors' background

---

[11](...continued)
averments of Ms. Reed's operative complaint to the identified public disclosures. Accordingly, Ms. Reed's assertion that the district court conducted a faulty analysis of the summary judgment record is ultimately of no moment.  *Cf. Rivera v. City & County of Denver*, 365 F.3d 912, 920 (10th Cir. 2004) ("Because our review is de novo, we need not separately address Plaintiff's argument that the district court erred by viewing evidence in the light most favorable to the City and by treating disputed issues of fact as undisputed.").

[12]      We, like other circuits, would have reservations about keeping our analysis of Ms. Reed's allegations solely at such a high level of generality.  *See Mateski*, 816 F.3d at 578 (agreeing with the "Seventh Circuit's warning against reading *qui tam* complaints at only the 'highest level of generality'" (quoting *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 831 (7th Cir. 2013))).  But at what precise level of generality we should compare a relator's claims with allegations in public disclosures is a difficult question. The Act tells us to ask if the relator's claims are "substantially the same."  31 U.S.C. § 3730(e)(4)(A).  The ordinary meaning of "substantial" is: "concerning the essentials of something."  THE NEW OXFORD AMERICAN DICTIONARY 1687 (2d ed. 2005).  And the ordinary meaning of "same" is: "identical; not different; unchanged" or "of an identical type."  *Id.* at 1498.  "Substantially the same," then, connotes a standard that requires only the *essentials* of the relator's allegations to be identical to or of an identical type as those disclosed publicly.  This plain-meaning analysis comports with our precedent.  *See Boothe*, 496 F.3d at 1174 (noting that "a *complete* identity of allegations" is unnecessary; it is enough for "the essence of" the relator's allegations to be "'derived from' a prior public disclosure").  We need not put a finer point on this issue in this case.  That is because it is clear to us that only if we accept Ms. Reed's hyper-specific reading that requires near-complete identity of allegations could we conclude that her allegations are not substantially similar to those in the public disclosures.  And our precedent forecloses such a hyper-specific reading.  *See id.*

31

investigations. And that Congress held hearings to probe the background-investigation industry's alleged practice of using "false, incomplete, or rushed information gathering" underscored the pre-existing public awareness of a strong probability of fraud in the industry. Aplt.'s App. at 411 & n.3. What is more, the criminal prosecutions of individual investigators confirmed that the government knew that investigators in the industry were falsifying information in their reports.

Moving down a rung on the generality ladder to more specific footing, Ms. Reed's claims allege fraud not only in the background-investigation industry generally, but also in KeyPoint's specific background-investigative practices. That information, too, was old news to the government. After all, the government prosecuted a former KeyPoint employee for "rac[ing] through investigations" and lying "about conducting thorough background checks when they were incomplete and rushed." *Id.* at 410. News reports from 2013 added to this knowledge by reporting that OPM had found problems "with procedures and safeguards used by all three private contractors—USIS, KeyPoint . . . and CACI." *Id.* at 303. To be sure, the news reports avoided explicitly accusing KeyPoint of defrauding the government. But direct allegations of fraud were unnecessary to put the government on the trail of KeyPoint's fraud. *Cf. Winkelman*, 827 F.3d at

32

208 (explaining that it is enough that the disclosures "lead to a plausible inference of fraud" (quoting *United States ex rel. Ondis v. City of Woonsocket*, 587 F.3d 49, 54 (1st Cir. 2009))); *United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 814 (11th Cir. 2015) (same); *Boothe*, 496 F.3d at 1174 ("[A] *complete* identity of allegations, even as to time, place, and manner [is unnecessary]."); *Fine*, 70 F.3d at 572 (noting that public disclosures need not allege "any wrongdoing"). Moreover, a 2010 OPM audit report revealed both that KeyPoint sometimes "did not conduct the required amount of re-contacts" in its investigations, Aplt.'s App. at 289, and that there were "falsification and[] integrity issues" with investigations done by USIS, KeyPoint, and CACI, *id.* at 261. The government, then, did not need Ms. Reed's allegations to pick up the scent of fraud at KeyPoint.

At their most specific, Ms. Reed's claims allege that KeyPoint knowingly defrauded the government by submitting fraudulent reports about the completeness and accuracy of its investigations. The government could have inferred as much from the public disclosures. Consider the USIS lawsuit. That suit alleged that USIS failed to review investigations, failed to do adequate investigations, and sent false reports to OPM. Those are the same basic failings Ms. Reed accuses KeyPoint of. Furthermore, the USIS

33

suit alleged that investigators sent cases "to OPM that were represented as Field Finished" when, in truth, they were unreviewed or "had not been investigated at all." Aplt.'s Reply Br., Addendum A, at 5. Ms. Reed's suit similarly asserts that KeyPoint sent OPM false claims "certifying that [its] investigators conducted complete, accurate, and proper investigations." Aplt.'s App. at 104, ¶ 359.

Considering this information from the USIS lawsuit and the other publicly disclosed matters discussed above, we conclude that the public disclosures were sufficient to set the government on the trail of KeyPoint's alleged fraud without Ms. Reed's assistance. Our cases reinforce this conclusion. Take *Fine*, for example. The relator there accused Sandia Corporation of misappropriating nuclear waste funds. 70 F.3d at 569. At the time, Sandia was one of only nine laboratories receiving federal funds from the Department of Energy. Before the relator's suit, a government report documented how three such laboratories, including Sandia, funded their discretionary research. The report concluded that the two other laboratories—but, notably, not Sandia—were fraudulently "taxing" nuclear waste funds in order to bolster their research programs, possibly in violation of federal law. *Id.* Again without implicating Sandia, a later congressional hearing further probed the Department of Energy's

acquiescence to such behavior from its laboratories.  As we saw it, that neither the report nor the congressional hearing named Sandia as a wrongdoer was not determinative.  *Id.* at 572.  We reasoned that because the public disclosures had "identified the problem and [there was] an easily identifiable group of probable offenders," the disclosures "were sufficient to put the government on notice as to Sandia's potential for misappropriating nuclear waste funds."  *Id.*  Thus, we held that the relator's allegations were substantially the same to those in the report and the congressional hearing.  *Id.*

The same reasoning applies here.  As in *Fine*, the public disclosures here identified the problem—fraud in background investigations—and traced that problem to an easily identifiable group of probable offenders (USIS, KeyPoint, and CACI).  As in *Fine*, Congress held hearings to probe the suspected fraud in this limited industry.  Moreover, akin to *Fine*, a government report (here, the 2010 OPM audit report) laid bare the heart of the matter—i.e., the falsification and integrity issues that plagued the background-investigation industry.

But unlike in *Fine*, some of the public disclosures explicitly linked KeyPoint to the suspected fraud.  The OPM audit said that "Contractors" had falsification issues; that defined term meant USIS, KeyPoint, and

CACI. And the news reports publicized that OPM had "found problems with procedures and safeguards used by all three private contractors—USIS, KeyPoint . . . and CACI." Aplt.'s App. at 303. Thus, although the public disclosures did not say the words "KeyPoint defrauded the government," the link that the disclosures forged between KeyPoint and the fraud was even stronger than the one in *Fine*, where we held that the substantially-the-same standard was satisfied. It ineluctably follows that this link was sufficient here to satisfy that standard—that is, to have set the government on the trail of KeyPoint's alleged fraud without Ms. Reed's help.

Ms. Reed's attempts to distinguish *Fine* fall short. For starters, Ms. Reed is mistaken in asserting that "no publicly disclosed information prior to [her] lawsuit indicated that KeyPoint was a wrongdoer." Aplt.'s Reply Br. at 10. The news reports linked KeyPoint to the fraud allegations roiling the industry. Even Ms. Reed's statement that "KeyPoint was not investigated for any suspected wrongdoing," *id.*, rings somewhat hollow. After all, the government prosecuted a former KeyPoint employee for lying "about conducting thorough background checks when they were incomplete and rushed." Aplt.'s App. at 410. Even if Ms. Reed's characterization of the absence of a KeyPoint-specific investigation were correct, the fact that KeyPoint was not named as a wrongdoer would not distinguish *Fine*;

36

instead, it would reinforce the parallels with it. And those parallels persist even though—as Ms. Reed points out—unlike the Department of Energy, OPM never "acquiesced to or implicitly approved any fraudulent schemes." Aplt.'s Reply Br. at 10. Ms. Reed overstates the significance of the Department of Energy's acquiescence in *Fine*. We noted this agency conduct there to emphasize that the government knew of the underlying problem at issue in a limited industry; our point was not that the acquiescence itself was independently important. *See Fine*, 70 F.3d at 571. In sum, Ms. Reed errs in suggesting that *Fine* is materially distinguishable. It is not. To the contrary, it bolsters our conclusion that Ms. Reed's allegations are substantially the same as the publicly disclosed allegations.

*In re Natural Gas Royalties* further supports our view on the substantially-the-same question. The relator there alleged that certain natural gas companies used fraudulent measurement techniques to underpay federal royalties. The relevant public disclosures included (1) congressional documents revealing problems with measurement techniques in the natural-gas industry, (2) an earlier *qui tam* suit against different gas companies for the same fraudulent practices, and (3) press accounts reporting on the earlier suit and "disclos[ing] the industrywide nature of [the suit's] broad allegations." 562 F.3d at 1042. On appeal, the relator

37

argued that these disclosures were not substantially the same as his allegations because the specific "Defendants and techniques were not identified in any public disclosed allegation." *Id.* at 1040. This court disagreed.

Citing *Fine*, we explained in *In re Natural Gas Royalties* that "the public disclosures at issue named a significant percentage of industry participants as wrongdoers and indicated that others in the industry were very likely engaged in the same practices." *Id.* at 1042. These revelations alleviated the burden for the government "to comb through myriad transactions performed by various types of entities in search of potential fraud." *Id.* Rather, the government needed only to investigate the measurement techniques used by a small pool of actors to ferret out the fraud. For those reasons, we held that, even without naming the specific defendants and techniques identified by the relator, "the allegations of industrywide gas mismeasurment disclosed" in the public documents "were sufficient to set the government on the trail of the fraud as to all Defendants." *Id.* at 1043.

So too here. The allegations in the public disclosures identified pervasive fraud in the background-investigation industry. Recall that in the years before Ms. Reed's suit, the government prosecuted individual

38

investigators for allegedly falsifying information in their reports. Furthermore, a 2013 news article reported that the government was "pursuing suspected fraud in the granting of security clearances" by contractors. Aplt.'s App. at 308. And the USIS suit alleged that one of KeyPoint's two main competitors (i.e., USIS) falsely told OPM that it had provided "accurate and complete investigations." Aplt.'s Reply Br., Addendum A, at 10.

As in *In re Natural Gas Royalties*, the public disclosures here obviated the need for the government "to comb through myriad transactions performed by various types of entities in search of potential fraud." 562 F.3d at 1042. The disclosures identified three main players (including KeyPoint), and generally unearthed the type of fraud—false certifications of accurate and complete investigations—that the government needed to look for. Guided by *In re Natural Gas Royalties*, we conclude that the publicly available information here was more than enough to set the government on the trail of KeyPoint's fraud without Ms. Reed's allegations.

Ms. Reed rejects such a conclusion. She first argues that her allegations "relate to a different entity" than the entities—notably, USIS—accused of wrongdoing in the public disclosures. Aplt.'s Opening Br. at 12. Ms. Reed is quick to point out that the USIS suit made "no

39

allegations against KeyPoint" and that none of the public disclosures expressly accused KeyPoint of defrauding the government. *Id.* at 18. Maybe so. But the substantially-the-same standard does not demand that the disclosures identify the defendant by name as the wrongdoer. *See In re Nat. Gas Royalties*, 562 F.3d at 1039. To the contrary, it is enough that the "public disclosures alleged industry-wide fraud" and "provide[d] enough information" to link the defendant to the scheme.[13] *United States ex rel. Lager v. CSL Behring, L.L.C.*, 855 F.3d 935, 946 (8th Cir. 2017). In a similar way, "the public disclosure bar contains no requirement that a public disclosure use magic words." *Winkelman*, 827 F.3d at 209. Thus, although the public disclosures did not say the magic words "KeyPoint defrauded the government," the disclosures were sufficient to link KeyPoint to fraud in an industry with only three players. No more is required.

Ms. Reed next argues that her allegations substantially differ from the

---

[13]    *See also Bellevue*, 867 F.3d at 719 (noting that the substantially-the-same standard requires only "that the government had enough information" from the public disclosures to infer that the defendant knowingly violated the Act); *Osheroff*, 776 F.3d at 814 (same); *Jamison*, 649 F.3d at 329 ("[T]he public disclosures need not name particular defendants so long as they 'alerted the government to the industry-wide nature of the fraud and enabled the government to readily identify wrongdoers through an investigation.'" (quoting *In re Nat. Gas Royalties*, 562 F.3d at 1039)); *United States ex rel. Gear v. Emergency Med. Assocs. of Ill., Inc.*, 436 F.3d 726, 729 (7th Cir. 2006) (rejecting "argument that for there to be public disclosure, the specific defendants named in the lawsuit must have been identified in the public records").

publicly disclosed allegations because she exposed different schemes.  For

instance, she maintains that "USIS had a very specific fraudulent scheme

that it used to facilitate 'dumping' cases."  Aplt.'s Reply Br. at 5.  That

scheme, Ms. Reed explains, involved representing to OPM that cases were

complete when they actually were unfinished or "had not been investigated

at all."  *Id.*  Her complaint, by contrast, describes "several types of

fraudulent schemes specific to KeyPoint that are entirely unrelated to the

USIS case or any of the other publicly disclosed information."  *Id.* at 6.

Ms. Reed is right that some of the schemes she exposed—especially,

the scheme involving the TTP—added to the government's knowledge

(more on this subject later), but these additions do not alter our

substantially-the-same assessment.  For now, the relevant question is only

whether the public disclosures set the government on the trail of KeyPoint's

fraud.  As we have explained, this does not require "*complete* identity of

allegations."  *Boothe*, 496 F.3d at 1174.  Rather, it is enough if the relator's

complaint is "at least 'in . . . part'" substantially the same as "the publicly

disclosed information."  *Osheroff*, 776 F.3d at 814 (alteration in original)

(quoting *Battle v. Bd. of Regents*, 468 F.3d 755, 762 (11th Cir. 2006) (per

curiam)).

Moreover, it cannot be gainsaid that in significant, material respects

41

Ms. Reed's complaint averments are substantially the same as the complaint averments in the USIS suit. For instance, Ms. Reed's complaint alleges that KeyPoint conducted "improper, incomplete, and inaccurate investigations." Aplt.'s App. at 33, ¶ 74. The USIS complaint likewise alleges that USIS "failed to provide accurate and complete investigations." Aplt.'s Reply Br., Addendum A, at 10.[14] And there are other substantial similarities between the complaints. *Compare* Aplt.'s App. at 32, ¶ 64 (alleging that KeyPoint "transformed almost every aspect of its investigative processes to maximize profits by hitting deadlines and taking on as much work as possible, without concern for the quality, accuracy, or completeness of its investigations"), *with* Aplt.'s Reply Br., Addendum A, at 5 (alleging that USIS pressured "Field Investigators to submit a large number of [reports of investigations] in a short amount of time in order to meet the revenue goals"). Therefore, given these substantial similarities, that Ms. Reed's complaint revealed one or more KeyPoint fraudulent schemes that are distinct from those alleged in the USIS lawsuit does not dissuade us from the view that the USIS suit helped put the government on the trail of KeyPoint's alleged fraud.

---

[14]    *Compare also* Aplt.'s App. at 88, ¶ 244 ("Each case was submitted as though it had been properly completed, reviewed, and checked when none had received the required oversight."), *with* Aplt.'s Reply Br., Addendum A, at 6 ("USIS knowingly submitted Cases to OPM for payment that they knew had not been reviewed . . . .").

42

Finally, Ms. Reed argues that the district court erred by not considering 2014 congressional testimony from a KeyPoint executive, Ms. Ordakowski, in its substantially-the-same analysis. In that testimony, Ms. Ordakowski told Congress that KeyPoint met or exceeded OPM standards and had "never wavered from its focus on quality." Aplt.'s Opening Br. at 21. Ms. Reed reasons that "if the government had some suspicions about the quality of KeyPoint's work," this testimony would have "throw[n] the government off the trail of the type of fraud [that Ms. Reed] alleges." *Id.*

This argument crumbles upon even brief reflection. First of all, Ms. Ordakowski testified months after Ms. Reed communicated her allegations to DOJ and after she sued KeyPoint. So the substance of Ms. Ordakowski's testimony tells us nothing about whether the government would have picked up the trail of fraud at KeyPoint based on the information it already had when Ms. Reed sued KeyPoint. Leaving aside this space-time-continuum problem, Ms. Reed's argument defies common sense. That Congress called a KeyPoint executive to testify about problems with background investigations strongly suggests that Congress thought there *was* a problem and that KeyPoint potentially was among the culprits. *Cf. Fine*, 70 F.3d at 572 ("[T]he public disclosures here were sufficient to put the government on notice as to Sandia's potential for misappropriating nuclear waste funds

43

. . . ."). Simply put, Ms. Ordakowski's testimony supports the district court's (and our) conclusion that the public disclosures were sufficient to have alerted the government to KeyPoint's potential for fraud.

In summary, we agree with the district court that the allegations in Ms. Reed's *qui tam* claims are substantially the same as those in the public disclosures. Thus, *unless* Ms. Reed is an "original source" of the information in her claims, the public disclosure bar prevents those claims from proceeding.

**B**

We now take up the question of whether Ms. Reed is an original source. Recall that the district court concluded that Ms. Reed was not an original source and therefore dismissed her *qui tam* claims under the public disclosure bar. Ms. Reed argues that in doing so the district court made both a procedural and a substantive error. The court's procedural error, she says, was excluding some of the evidence that she submitted to the court after it converted KeyPoint's motion to dismiss to a summary-judgment motion. As for the alleged substantive error, Ms. Reed contends that the district court erred in concluding that she was not an original source, in particular, because her complaint averments did not materially add to the information in the public disclosures.

44

As we explain below, Ms. Reed loses the procedural battle but wins the substantive war. That is, we hold that the district court did not err in excluding certain proffered evidence at summary judgment, but we hold that the court did err in concluding that Ms. Reed was not an original source because her complaint averments did not satisfy the materially-adds standard.

**1**

When a district court relies on material outside the complaint to resolve a Rule 12(b)(6) motion, it ordinarily must convert that motion "into a motion for summary judgment." *Burnham v. Humphrey Hosp. REIT Tr., Inc.*, 403 F.3d 709, 713 (10th Cir. 2005); *see* FED. R. CIV. P. 12(d). If a district court intends to convert a motion, it should inform the parties of this intention and give them "the opportunity to present to the court all material made pertinent to such motion by Rule 56." *Nichols v. United States*, 796 F.2d 361, 364 (10th Cir. 1986) (quoting *Ohio v. Peterson, Lowry, Rall, Barber & Ross*, 585 F.2d 454, 457 (10th Cir. 1978)). Converting a motion "without giving the adverse party an opportunity to present pertinent material is error." *Adams v. Campbell Cty. Sch. Dist.*, 483 F.2d 1351, 1353 (10th Cir. 1973).

We review a district court's choice to exclude evidence at the

summary-judgment stage, however, "only for an abuse of discretion." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004). Without "a definite and firm conviction that the [district] court made a clear error of judgment or exceeded the bounds of permissible choice," we cannot say that the court abused its discretion. *Id.* (quoting *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1016 (10th Cir. 2002)).

The district court converted KeyPoint's Rule 12(b)(6) motion into a summary-judgment motion. Before doing so, it allowed the parties to present relevant material. Ms. Reed asked to present three sets of materials: (1) documents that she had given the government both before and after she filed her *qui tam* suit, (2) a declaration in which she attested "to the source of her allegations," and (3) more "briefing on the public disclosure and original source issues." Aplt.'s Opening Br. at 30.

After considering Ms. Reed's proffered materials, the district court allowed her to submit only the documents she gave the government in her pre-filing disclosures: specifically, the court excluded any post-filing disclosures to the government, Ms. Reed's declaration, and the additional briefing. Those other materials, the court reasoned, would not add "any material information" helpful to the public-disclosure-bar inquiry because Ms. Reed's complaint made "clear what the source of [her] knowledge was"

46

and because the parties had fully briefed the applicable legal standards.

Aplt.'s App. at 404. Thus, under the court's view, the post-filing

documents, declaration, and additional briefing "were not 'made pertinent'

by the conversion." *Id.* (quoting *Nichols*, 796 F.2d at 364).

To the extent that Ms. Reed argues that the district court erred by

refusing "to allow [her] *the opportunity to provide* all material evidence,"

Aplt.'s Opening Br. at 30 (emphasis added), the record proves otherwise.

The court notified the parties of its intention to convert the motion to a

summary-judgment motion, and it gave them time to provide pertinent

material. Unlike the parties in the cases she cites,[15] Ms. Reed had ample

opportunity to provide the court with "material made pertinent by Rule 56."

*Nichols*, 796 F.2d at 364 (quoting *Peterson*, 585 F.2d at 457). Indeed, the

court twice permitted Ms. Reed to amend her complaint to include the post-

filing information she now complains the court excluded. In the end, the

court gave Ms. Reed notice of the conversion, considered her proffered

material, and even accepted some of that evidence.

And the district court's exclusion of the post-filing disclosures, Ms.

Reed's declaration, and the added briefing was well within "the bounds of

---

[15]    *See Peterson*, 585 F.2d at 457 (reversing because district court gave party no chance to present material); *Adams*, 483 F.2d at 1353 (same).

permissible choice." *LifeWise Master Funding*, 374 F.3d at 927 (quoting *Lantec*, 306 F.3d at 1016). Simply put, the court reasonably concluded that none of those items contained material and relevant information that the court did not already possess. Therefore, the excluded materials were not "made pertinent" by the conversion. *Nichols*, 796 F.2d at 364 (quoting *Peterson*, 585 F.2d at 457).

Ms. Reed, however, begs to differ. She says the excluded post-filing disclosure statement and personal declaration were "pertinent" to "establish[ing] her status as an original source." Aplt.'s Opening Br. at 30. These materials, Ms. Reed contends, would have shown "the extent to which [her] allegations materially added to those allegations that had purportedly been publicly disclosed." *Id.* at 33. The problem for Ms. Reed is that—as she admitted—the allegations in her complaint were "based almost entirely upon the documents that were discussed during the pre-filing meeting with [DOJ]." Aplee.'s Suppl. App., Vol. VII, at 1419 (Ms. Reed's Objs. to R. & R., filed Sept. 12, 2017). And Ms. Reed twice amended her complaint to include the crux of the information from her post-filing disclosures to the government. Ms. Reed's proffered materials, then, would have merely duplicated that existing information in the twice-amended complaint.

48

In the end, we cannot say that the district court abused its discretion as to this procedural matter. Thus, we leave undisturbed the district court's ruling excluding the post-filing disclosures, Ms. Reed's declaration, and the additional briefing.

## 2

### a

Having resolved the procedural issue, we turn to the substance of the original-source question. The False Claims Act instructs courts to dismiss *qui tam* claims under the public disclosure bar "if substantially the same allegations . . . were publicly disclosed"—*unless* the relator is "an original source of the information." 31 U.S.C. § 3730(e)(4)(A). We have already resolved the substantially-the-same question in KeyPoint's favor. We now must decide whether the district court erred in determining that Ms. Reed's *qui tam* claims cannot escape the public disclosure bar through the original-source exception.

Two types of relators qualify as "original sources." The first type is a relator who, "prior to a public disclosure [within the meaning of the Act] . . . , has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based." *Id.* § 3730(e)(4)(B). The second type is a relator with "knowledge that is independent of and

49

materially adds to the publicly disclosed allegations" and who gave the government this information before filing her *qui tam* claims. *Id.*

Before the district court, Ms. Reed argued that she was an original source of the second type. The district court agreed that Ms. Reed had in fact given the government her information before she sued KeyPoint. But the court ruled that Ms. Reed's allegations did not "materially add" to the public disclosures. And so, without addressing whether Ms. Reed's knowledge was "independent of" the public disclosures, the district court concluded that Ms. Reed was not an original source.

On appeal, Ms. Reed argues that the district court erred in concluding that her allegations did not "materially add" to the public disclosures. As for the "independent of" portion of the original-source inquiry, Ms. Reed says in a short footnote that she satisfies that criterion, too. *See* Aplt.'s Opening Br. at 29 n.8. For its part, KeyPoint posits that "regardless of whether her knowledge was 'independent of' the public disclosures," Ms. Reed is not an original source because her allegations "did not materially add to the public disclosures." Aplee.'s Resp. Br. at 34.

Our circuit has yet to expound on the meaning of the "materially adds" language in the original-source exception. Congress added this language in the same 2010 amendment discussed earlier but did not define

50

the term.  Since then, however, several other courts of appeals have interpreted the "materially adds" requirement.[16]

We are particularly persuaded by the First Circuit's analysis in *Winkelman*.  There, the court framed the relevant question for the materially-adds inquiry as "whether the relators' allegedly new information is sufficiently significant or essential so as to fall into the narrow category of information that materially adds to what has already been revealed through public disclosures."  827 F.3d at 211.  To determine what information falls into the materially-adds bucket, the First Circuit looked to the ordinary legal meaning of "material"—i.e., an addition that "is '[o]f such a nature that knowledge of the item would affect a person's decision-making,' or if it is 'significant,' or if it is 'essential.'" *Id.* (quoting BLACK'S LAW DICTIONARY 1124 (10th ed. 2014) [hereinafter BLACK'S]).  In other words, *Winkelman* teaches that a relator "materially adds" to public

---

[16]    Although KeyPoint concedes that the meaning of "materially adds" "is a matter of first impression for the Tenth Circuit," Aplee.'s Resp. Br. at 34, it nonetheless relies on pre-2010-amendment cases to argue that Ms. Reed's allegations do not materially add to the public disclosures, *see id.* at 36–37.  Although the 2010 amendment ratified our prior cases by adopting the "substantially the same" language that we already used, the amendment added a new component to the original-source analysis—namely, the materially-adds inquiry.  Before the 2010 amendment, our original-source analysis asked whether the relator "had direct and independent knowledge of the information underlying his allegations." *In re Nat. Gas Royalties*, 562 F.3d at 1043.  We did not ask whether the relator's knowledge materially added to the public disclosures.  Thus, our pre-2010-amendment cases are not germane to the materially-adds inquiry.

disclosures if her information "is sufficiently important to influence the behavior of the recipient." *Id.*

The *Winkelman* definition of "materially adds" finds support in the Act's provisions defining the scope of liability, which state that "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4); *see also* Joel D. Hesch, *Restating the "Original Source Exception" to the False Claims Act's "Public Disclosure Bar" in Light of the 2010 Amendments*, 51 U. OF RICH. L. REV. 991, 1019 (2017) (looking to § 3729(b)(4) in attempting to discern the meaning of "materially adds" and ultimately concluding that it means that "a reasonable person would attach importance to the information"). Furthermore, though they have applied the definition in different ways, a few federal circuit courts have expressly adopted a like definition of "materially adds." *See United States ex rel. Advocates for Basic Legal Equal., Inc. v. U.S. Bank, N.A.*, 816 F.3d 428, 431 (6th Cir. 2016) ("Materiality in this setting requires the claimant to show it had information '[o]f such a nature that knowledge of the item would affect a person's decision-making,' is 'significant,' or is 'essential.'" (quoting BLACK'S, *supra*, at 1124)); *United States ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 306 (3d Cir. 2016) (concluding

based on dictionary definitions of the separate words "materially" and "add" that to "'materially add[]' to "the publicly disclosed allegation or transaction of fraud, a relator must contribute significant additional information to that which has been publicly disclosed so as to improve its quality"); *see also United States ex rel. Paulos v. Stryker Corp.*, 762 F.3d 688, 694–95 (8th Cir. 2014) (relying on dictionary definitions of the separate words "material" and "add" and suggesting that information "materially adds" to something when it "substantially" or "considerably" "improve[s] or alter[s] its quality or nature" (quoting THE NEW OXFORD AMERICAN DICTIONARY 18, 1079 (3d ed. 2010))).

*Winkelman* also offered several helpful guideposts for how to distinguish between new but immaterial information and material additions. It noted that what is "significant" or "essential" depends in part on "the level of detail in [the] public disclosures." 827 F.3d at 211. That is, the fewer questions the public disclosures answer, the more room there is for a relator's allegations to add material information. However, the court pointed out that "a relator who merely adds detail or color to previously disclosed elements of an alleged scheme is not materially adding to the public disclosures." *Id.* at 213. *Winkelman* also recognized the potential overlap between the materially-adds inquiry and the inquiry into "whether

53

the relator's allegations are substantially the same as th[e] prior revelations." *Id.* at 211. "Despite this potential for overlap," the First Circuit explained, "the 'materially adds' inquiry must remain conceptually distinct; otherwise, the original source exception would be rendered nugatory." *Id.* at 211–12.

In sum, we find persuasive the materially-adds standard that the First Circuit articulated in *Winkelman*. Under that standard, a relator who discloses new information that is sufficiently significant or important that it would be capable of "influenc[ing] the behavior of the recipient"—i.e., the government—ordinarily will satisfy the materially-adds standard. *Id.* at 211. On the other hand, a relator who merely adds background information or details about a known fraudulent scheme typically will be found not to have materially added to the publicly disclosed information. *See id.* at 213.

We recognize that the Seventh Circuit has taken a different path. For example, in *Cause of Action v. Chicago Transit Authority*, 815 F.3d 267 (7th Cir. 2016), the court held that if a relator's "allegations are substantially similar to those contained in the" public disclosures, her allegations *cannot* "'materially add[]' to the public disclosure[s]." *Id.* at 283. This standard, however, has the effect of collapsing the materially-adds inquiry into the substantially-the-same inquiry. As such, we cannot

54

embrace it.

The plain terms of the original-source exception contemplate that some *qui tam* claims involving allegations that are substantially the same as publicly disclosed allegations nevertheless will survive the public disclosure bar because they materially add to the publicly disclosed information.  Yet, the Seventh Circuit's view runs counter to this idea.  And as a logical matter, its view is simply unpersuasive.  After all, what good is an exception (i.e., the original-source exception) that does not actually except anything?  *See* Hesch, *supra*, at 1016 (noting that because the materially-adds condition "is designed to be an exception to the public disclosure bar," it "is not meant to block out relators simply because there had been a qualifying public disclosure that contains similar allegations").

Reflecting this sort of reasoning, one commentator observed:

> The addition of the new requirement that the information "materially add" to the publicly disclosed information has caused some confusion. Some courts have required the information to be "qualitatively different" from the publicly disclosed information or *not substantially the same as the public disclosure*. That approach renders the [materially-adds] requirement the same as the public disclosure question rather than part of an exception to the public disclosure bar. Materially adds connotes the addition of something of significance or import and whether it is substantially the same as the type of information already publicly disclosed should not matter.

Claire M. Sylvia, THE FALSE CLAIMS ACT: FRAUD AGAINST THE

55

GOVERNMENT § 11:68, Westlaw (database updated June 2018) (emphasis added) (footnote omitted); *see also* Hesch, *supra*, at 1017 ("[M]erely because the allegations are substantially the same as a qualifying public disclosure, a relator still qualifies as an original source if she brings something to the table that adds value."). In sum, we agree with the First Circuit's assessment in *Winkelman*: "[T]he 'materially adds' inquiry must remain conceptually distinct; otherwise, the original source exception would be rendered nugatory." 827 F.3d at 211–12.

The path plotted by the Third Circuit in its noteworthy decision, *Moore*, is less clearly defined. However, in fleshing out our approach, we highlight a possible point of distinction with it. In *Moore*, the Third Circuit looked to "Rule 9(b)'s pleading requirement," 812 F.3d at 306, as "a helpful benchmark for measuring 'materially adds,'" *id.* at 307. Relying on this "standard" from Rule 9(b), the court took the position that "a relator materially adds to the publicly disclosed allegation or transaction of fraud when it contributes information—distinct from what was publicly disclosed—that adds in a significant way to the essential factual background: 'the who, what, when, where and how of the events at issue.'" *Id.* (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)).

Perhaps *Moore* is amenable to a narrow interpretation. *Cf. id.* at 307 (noting that the materially-adds standard is not met unless the relator's information "adds *in a significant way* to the essential factual background" and describing the Rule 9(b) factors as only "a helpful benchmark," without expressly saying that the presence of one or more of the factors is always dispositive) (emphasis added)). *But see United States v. Medtronic, Inc.*, 327 F. Supp. 3d 831, 851 (E.D. Pa. 2018) (contrasting *Moore*'s "relatively broad definition of materiality" with "*Winkelman*['s] . . . narrower definition"). However, insofar as *Moore* is (reasonably) interpreted as holding that a relator's averments that add a not-insignificant who, what, when, where, or how to a publicly disclosed fraudulent scheme should be uniformly deemed to meet the materially-adds standard, we must disagree.

In our view, the materially-adds analysis must be firmly grounded in the facts and circumstances of a particular case. And those facts and circumstances will guide our determination of whether the who, what, when, where, or how actually should be considered sufficiently significant or important to affect the government's actions regarding the fraudulent scheme. For example, as discussed further below, when, as here, the publicly disclosed fraud exists within an industry with only a few players, a relator who identifies a particular industry actor engaged in the fraud (i.e.,

57

the "who") is unlikely to materially add to the information that the public disclosures had already given the government.

We are concerned that *Moore* (as interpreted above) could allow the original-source exception to swallow the public disclosure bar. Specifically, one might read the Third Circuit's approach in that case to permit "a relator who merely adds detail or color to previously disclosed elements of an alleged scheme" to qualify as an original source. *Winkelman*, 827 F.3d at 213; *see Medtronic*, 327 F. Supp. 3d at 851 ("*Moore* and *Winkelman* apply two different standards: *Moore* adopted a relatively broad definition of materiality while *Winkelman* adopted the narrower definition from *Universal Health* [*Services, Inc. v. United States ex rel. Escobar*, 579 U.S. ----, 136 S. Ct. 1989 (2016)]." (citation omitted)). Like the First Circuit, we do not think that adding detail or color is enough. *See also United States ex rel. Hastings v. Wells Fargo Bank, NA, Inc.*, 656 F. App'x 328, 331–32 (9th Cir. 2016) (unpublished) (Mem. Op.) ("Allegations do not materially add to public disclosures when they provide only background information and details relating to the alleged fraud—they must add value to what the government already knew.").

Thus, we are guided here by materially-adds principles that are generally consistent with those the First Circuit articulated in *Winkelman*.

58

We believe that these principles are faithful to the balance struck by Congress, in amending the original-source exception in 2010, between "attracting whistleblowers and not paying rewards" to relators who fail to provide information that "materially adds value." Hesch, *supra*, 1026, 1040.

**b**

We now turn to the question of whether Ms. Reed satisfies this standard. Although we conclude that most of Ms. Reed's arguments relative to this standard fall short, we are persuaded that her complaint averments regarding the TTP program materially add to the information in the public disclosures. Therefore, she prevails on this component of the original-source inquiry.

Ms. Reed argues that her allegations materially add to the public disclosures in several ways. First, Ms. Reed points out that her complaint identifies "a new defendant" (KeyPoint). Aplt.'s Opening Br. at 25. Second, she reasons that naming individual "investigators who violated OPM requirements" adds to the disclosures. *Id.* Third, Ms. Reed posits that she materially adds to the disclosures because she did her own investigation into KeyPoint. Fourth, she says that her allegations uncovered "new schemes to defraud the government (*e.g.*, the telephone

testimony violations)." *Id.*

To begin, we disagree that naming KeyPoint as a wrongdoer materially adds to the public disclosures. After all, the news reports linked KeyPoint to the suspected fraud in the background-investigation industry. And the 2010 OPM audit report revealed that there were "falsification and[] integrity issues" with investigations done by USIS, KeyPoint, and CACI. Aplt.'s App. at 261. Consequently, Ms. Reed is mistaken in suggesting that there was "no information concerning KeyPoint specifically in the public domain." Aplt.'s Opening Br. at 28. To be sure, the disclosures did not "use the word 'fraud'" when discussing KeyPoint. *Advocates for Basic Legal Equal.*, 816 F.3d at 432. But that omission is irrelevant because the disclosures "presented enough facts to create an inference of wrongdoing" by KeyPoint. *Id.* at 433 (quoting *United States ex rel. Jones v. Horizon Healthcare Corp.*, 160 F.3d 326, 332 (6th Cir. 1998)).

At bottom, the government already suspected fraud in the background-investigation industry. Counting KeyPoint, that industry only has three main players; and the disclosures linked KeyPoint to the suspected fraud. We cannot see how naming KeyPoint adds information of sufficient significance or importance "to influence the [government's] behavior." *Winkelman*, 827 F.3d at 211. Put another way, this is an instance in which

60

averments regarding the "who" of a publicly disclosed fraudulent scheme are not a material addition within the meaning of the original-source exception. *Cf. Moore*, 812 F.3d at 307.

Similarly, identifying individual investigators as wrongdoers "merely adds detail or color to previously disclosed elements of an alleged scheme." *Winkelman*, 827 F.3d at 213. The government knew that individual investigators (including a former KeyPoint employee) "lied about conducting thorough background checks when they were incomplete and rushed." Aplt.'s App. at 410. And a September 2013 article reported that the government was "pursuing suspected fraud in granting of security clearances" and had already convicted at least "19 private and government investigators for submitting fabricated reports." *Id.* at 308. True, Ms. Reed's allegations suggested that the problem was more pervasive at KeyPoint than the public disclosures hinted. But if identifying new employees engaged in fraud were enough, the original-source exception would burst from overbreadth. *Cf. Winkelman*, 827 F.3d at 212 (explaining that giving "specific examples of" publicly known fraud "does not provide any significant new information").

Ms. Reed also is mistaken that her allegations materially add to the public disclosures because she did her own investigation into KeyPoint.

61

For starters, as KeyPoint rightly points out, "the 'materially adds' requirement . . . focuses on the *substance* of the allegations, not the *source*." Aplee.'s Resp. Br. at 37. That Ms. Reed's independent investigation confirmed, as to KeyPoint, some of the allegations floating around the public sphere is arguably relevant to the question of whether her knowledge is independent of the public disclosures, but that question is not presently before us. *See Kennard*, 363 F.3d at 1046–47 (explaining that relators had "direct and independent knowledge" because they did "their own investigation"). In sum, in our view, Ms. Reed's separate investigation is irrelevant to the materially-adds question. *See Winkelman*, 827 F.3d at 212 (rejecting argument that relators materially added to the public disclosures by "trumpet[ing] their personal knowledge of specific instances of alleged [fraud]"). As the Eighth Circuit remarked, "A relator is not an original source of information . . . simply because he discovered or suspected it *first*" through his own investigation if that investigation only confirms what was "already thoroughly revealed." *Paulos*, 762 F.3d at 694.

All that said, we ultimately conclude that Ms. Reed does satisfy the materially-adds standard. We reach that conclusion because we determine that Ms. Reed's allegations regarding the TTP materially add to the information available in the public disclosures for two related and

intertwined reasons. First, Ms. Reed makes specific allegations of both investigator- and management-level fraud in the distinct context of the TTP. Second, many of Ms. Reed's allegations concerning KeyPoint's responses to her reports of possible fraud in the TTP provide direct evidence of KeyPoint's scienter. Neither the allegations of investigator- and management-level fraud in the TTP context nor the allegations of KeyPoint's scienter were available via the public disclosures. Considered together, these allegations reveal a "new scheme[] to defraud the government" involving repeated violations of the TTP by KeyPoint investigators and management. Aplt.'s Opening Br. at 25. And they offer "[t]rue evidence of intent or guilty knowledge" by KeyPoint, Hesch, *supra*, at 1026, insofar as they aver Ms. Reed's specific knowledge of KeyPoint managers' efforts to knowingly cover up the TTP violations. *Cf. United States ex rel. Ambrosecchia v. Paddock Labs., LLC*, 855 F.3d 949, 955 (8th Cir. 2017) ("[Relator] claims that her information materially adds to the existing information by demonstrating scienter. However, the complaint provides no more than the simple, conclusory allegation that Defendants' actions were knowing . . . . Accordingly, [relator's] complaint is insufficient to plausibly state that she qualifies as an original source." (citation omitted)).

63

Ms. Reed's allegations of scienter make us especially confident that her allegations regarding KeyPoint's fraudulent TTP practices satisfy the materially-adds standard. False Claims Act "cases often turn on the issue of scienter." Hesch, *supra*, at 1024. Yet, "the government is never in a good position to have direct evidence of guilty knowledge." *Id.* Thus, Ms. Reed's allegations that KeyPoint's investigators and managers tried to *knowingly* cover up the TTP violations amplify the materiality of the underlying allegations of TTP fraud. *Cf. Winkelman*, 827 F.3d at 213 ("We do not rule out the possibility that furnishing information that a particular defendant is acting 'knowingly' (as opposed to negligently) sometimes may suffice as a material addition to information already publicly disclosed."); *Hesch*, *supra*, at 1027 ("[R]egardless of how well defined the fraud allegations are in a qualifying public disclosure, when a relator brings forth knowledge of scienter that is not specifically contained in a qualifying public disclosure it should be presumed to materially add value.").

Now consider those underlying allegations. Recall that investigators were generally required to conduct in-person interviews, but the TTP permitted them to do telephone interviews under some circumstances so long as they kept their total number of telephone interviews below a certain percentage threshold. Each month, OPM would send KeyPoint a list of

64

investigators who exceeded their allotted number of telephone interviews during the last month. KeyPoint then would be obliged to send OPM "corrective action report[s]" explaining each infraction and what it was doing to remedy the problem. Aplt.'s App. at 31, ¶ 54.

Ms. Reed avers that KeyPoint investigators repeatedly violated the TTP and KeyPoint management regularly falsified corrective action reports to cover up the violations. For instance, one corrective action report by a KeyPoint Field Manager justified an investigator's violations by claiming that telephone interviews were "justified due to weather and due 'to the remote and large geographical area [the investigator] work[ed].'" *Id.* at 90, ¶ 262. When Ms. Reed looked into the matter, she discovered that the report was false; the investigator's sources were actually "located in nearby Colorado, well within the territory he was required to cover in person" *Id.* at 90, ¶ 264. When Ms. Reed recommended that the investigator be disciplined for violating the TTP, rather than do so and correct the false corrective action report, a KeyPoint Regional Manager "tried to persuade [Ms.] Reed that [the investigator] was covering remote territory in Wyoming." *Id.* at 90, ¶¶ 265–267.

Similarly, Ms. Reed determined that another investigator was violating the TTP by "not giv[ing] many sources the opportunity for in-

65

person interviews," *id.* at 95 ¶ 298, and that KeyPoint management had falsely "certified that [the investigator] had not conducted the telephonic testimonies that OPM had indicated," *id.* at 96, ¶ 300. Ms. Reed specifically informed identified members of KeyPoint management that the investigator was violating the TTP—which meant that KeyPoint's prior certifications to OPM to the contrary were false. *See id.* But rather than discipline the investigator and correct the false certifications, the investigator's "Field Manager continued to issue Corrective Action Reports to OPM about [the investigator] that claimed geographic distance and source request, when Reed had already shown KeyPoint's management that [the investigator] had conducted phone interviews without attempting to conduct in-person interviews." *Id.* at 96, ¶ 310.

Furthermore, on more than one occasion, in response to Ms. Reed's efforts to correct problems in the TTP, "KeyPoint management told [her] to stop interfering." *Id.* at 95, ¶ 292; *see also id.* at 96, ¶ 308 ("[Ms.] Reed was later told to 'stop interfering.'"). In short, Ms. Reed's complaint offers pages of details describing how KeyPoint managers knowingly schemed to defraud the government by covering up systemic violations of the TTP.

None of the public disclosures accused KeyPoint—or the industry generally—of fraud relating to a TTP. The news reports, for instance,

66

focused generally on problems in the industry with "investigators who were found to have done substandard work in background checks." *Id.* at 303. The articles do not hint at systemic investigator fraud designed to evade the requirements of a TTP (e.g., its percentage ceiling for conducting telephone interviews), let alone discuss knowing efforts of management personnel to cover up that fraud. Likewise, Congress suspected KeyPoint and its competitors only of using "false, incomplete, or rushed information gathering" in its background investigations but unearthed no evidence that industry management knowingly lied about the circumstances in which they gathered information by telephone. *Id.* at 411 & n.3. The two OPM audits do not even reference a TTP or fraudulent corrective action reports covering up violations of such a program. And the USIS suit alleged that USIS investigators "dumped" incomplete and unreviewed cases to OPM and abused OPM's "Blue Zone software." Aplt.'s Reply Br., Addendum A, at 6–12. But this suit makes no mention of a TTP, corrective action reports, or a scheme by management to cover up deficiencies under that program.

In short, Ms. Reed's allegations regarding KeyPoint's fraudulent practices related to its TTP added material information to the public disclosures that satisfied the Act's materially-adds standard. These allegations had the effect of "expanding the scope of the fraud" revealed in

67

the public disclosures and introducing "knowledge of scienter that is not specifically contained in a qualifying public disclosure." Hesch, *supra*, at 1023, 1027. This is not a case where the relator's allegations contributed nothing more than personal "knowledge (even if gained early and independently)." *Paulos*, 762 F.3d at 694. Nor is it a situation where the allegations of fraud in the public disclosures were so detailed that there was no room for Ms. Reed to materially add to them with her allegations of KeyPoint's fraudulent TTP practices. *Winkelman*, 827 F.3d at 211 ("As the level of detail in public disclosures increases, the universe of potentially material additions shrinks."). Indeed, her allegations about KeyPoint's scheme to evade the TTP did more than "add[] detail or color to previously disclosed elements of an alleged scheme." *Id.* at 213; *see also Hastings*, 656 F. App'x at 331–32 ("Allegations do not materially add to public disclosures when they provide only background information and details relating to the alleged fraud—they must add value to what the government already knew."). Hence, we conclude that Ms. Reed's complaint averments relating to KeyPoint's fraudulent TTP practices reveal information "[o]f such a nature that knowledge of the item would affect [the government's] decision-making." *Winkelman*, 827 F.3d at 211 (first alteration in original) (quoting Black's, *supra*, at 1124). In other words, her allegations

68

materially add to the public disclosures.

The soundness of this conclusion is highlighted when one contrasts the materiality of the new fraudulent scheme that Ms. Reed alleges regarding the TTP with the *immateriality* of the added information at issue in *Osheroff*. The relator in *Osheroff* alleged that certain medical clinics were violating the federal anti-kickback law and related government contracts by providing "a variety of free services for patients . . . , including transportation, meals, spa and salon services, and entertainment." 776 F.3d at 808. An earlier lawsuit had disclosed a different clinic's similar practices. And news reports publicized that the defendant-clinics provided "'free lunch' . . . and free transportation." *Id.* at 813. In arguing that he was an original source, the relator emphasized that his complaint added to the public disclosures by revealing "the type of food the clinics served . . . , the destinations of some of the free transportation, the frequency of salon services, and the price of the substitute services or goods." *Id.* at 815. The Eleventh Circuit, however, was "not persuaded." *Id.* At best, the court explained, the relator's "complaint add[ed] background information and details relating to the value of the services offered, making it somewhat more plain that the clinics' programs could violate the [statute]." *Id.* That was not enough. The court held that under

69

the 2010 version of the False Claims Act, the relator's "information d[id] not materially add to the public disclosures, which were already sufficient to give rise to an inference that the clinics were providing illegal remuneration to patients." *Id.*

Ms. Reed's complaint averments relating to KeyPoint's distinct TTP fraud stand in stark contrast to the general background information regarding an existing fraudulent scheme that the relator delivered in *Osheroff*. Unlike in *Osheroff*, Ms. Reed's allegations do not add a few more breadcrumbs on an existing trail; they blaze a new trail.

We underscore that we do not rest our holding that Ms. Reed has satisfied the materially-adds standard based solely on *either* her allegations concerning specific instances of investigator- and management-level fraud in the TTP *or* her allegations concerning KeyPoint's responses to her reports of possible TTP fraud—notably, to cover up fraud—that evinced KeyPoint's scienter. Instead, we base our holding on the *combined, synergistic effect* of the allegations of distinct misconduct in the TTP *and* the related and intertwined allegations detailing KeyPoint's knowing efforts to cover up TTP violations. The combination of these allegations clearly permit Ms. Reed to satisfy the materially-adds standard. We need not—and thus do not—opine on whether either of the two related and intertwined

70

features of Ms. Reed's TTP allegations, standing alone, would be sufficient to satisfy the materially-adds standard.

\* \* \*

In sum, we agree with the district court that the allegations in Ms. Reed's *qui tam* claims are substantially the same as those in the public disclosures. But we disagree with the court's conclusion that Ms. Reed's allegations do not materially add to the public disclosures, such that she did not qualify as an original source. As a consequence, we vacate the district court's summary-judgment order that dismissed Ms. Reed's *qui tam* claims. However, because the district court did not reach the second part of the original-source standard—i.e., whether Ms. Reed's allegations are "independent of" the public disclosures—we remand the case for the district court to resolve that question in the first instance.[17] *See Tabor v.*

---

[17] We likewise decline KeyPoint's invitation to affirm the district court's judgment on alternative bases not ruled on by the district court. *See* Aplee.'s Resp. Br. at 58–60 (arguing that Ms. Reed's FCA claims fail for want of (1) particularity under Rule 9(b), (2) falsity, (3) materiality, and (4) scienter). Although it is true that we may affirm on any basis finding support in the record, *see Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011), we are often "reluctant" to do so when "we are deprived of the benefit of vigorous adversarial testing of the issue, not to mention a reasoned district court decision on the subject." *Abernathy v. Wandes*, 713 F.3d 538, 552 (10th Cir. 2013); *accord Sylvia v. Wisler*, 875 F.3d 1307, 1325 (10th Cir. 2017). KeyPoint offers only brief arguments in support of the alternative bases for affirmance. In these circumstances, the superior course of action is to remand so that district court may decide the issues in the first instance. *See United States v. McLinn*, 896 F.3d 1152, 1157 (10th Cir. 2018) (declining to rule on inadequately briefed issues "not fully addressed by the district

(continued...)

*Hilti, Inc.*, 703 F.3d 1206, 1227 (10th Cir. 2013) ("Where an issue has not been ruled on by the court below, we generally favor remand for the district court to examine the issue."); *see also Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.").

## III

We now turn to Ms. Reed's retaliation claim. The False Claims Act protects whistleblowers from retaliation by their employers. *See Potts*, 908 F.3d at 613–14 (discussing 31 U.S.C. § 3730(h)). To state a claim of retaliation, a plaintiff must meet her "burden of pleading facts" that prove (1) she engaged in protected activity, (2) the defendant "had been put on notice" of that protected activity, and (3) the defendant retaliated against the plaintiff "because of" that activity. *McBride v. Peak Wellness Ctr., Inc.*, 688 F.3d 698, 704 (10th Cir. 2012); *see also* 31 U.S.C. § 3730(h).

Ms. Reed alleges that KeyPoint retaliated against her by firing her for trying to stop it from violating the False Claims Act. The district court granted KeyPoint's Rule 12(b)(6) motion to dismiss this retaliation claim because Ms. Reed had, in the district court's view, inadequately pleaded that KeyPoint was on notice that she was engaging in protected activity.

[17](...continued)
court").

72

We review de novo "the district court's dismissal under Rule 12(b)(6)." *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 740 (10th Cir. 2018) (quoting *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1167 (10th Cir. 2010)). Dismissal under Rule 12(b)(6) "is appropriate only if the complaint, viewed in the light most favorable to plaintiff, 'lacks "enough facts to state a claim to relief that is plausible on its face."'" *Conner*, 543 F.3d at 1217 (quoting *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1236 (10th Cir. 2007)).

Applying these standards, we affirm the district court's dismissal of Ms. Reed's retaliation claim. At the outset, we are constrained to point out that the district court relied on a legally erroneous view of what constitutes protected activity. But we "can affirm the district court's dismissal on any ground sufficiently supported by the record." *GF Gaming Corp. v. City of Black Hawk*, 405 F.3d 876, 882 (10th Cir. 2005); *accord George v. Urban Settlement Servs.*, 833 F.3d 1242, 1254 (10th Cir. 2016). And we determine that, under the correct legal understanding of protected activity, Ms. Reed has failed to plead sufficient facts to show that KeyPoint was on notice of her purported protected activity. For that reason, we affirm the district court's order dismissing Ms. Reed's retaliation claim.

**A**

73

The False Claims Act protects whistleblowers who engage in "protected activity." *Armstrong*, 897 F.3d at 1286. Until 2009, protected activity included only "lawful acts done by the employee . . . in furtherance of an action under this section [i.e., a *qui tam* suit]." 31 U.S.C. § 3730(h) (2008). The circuit courts split over what conduct qualified as "in furtherance of" a *qui tam* action. Our circuit and several others interpreted that language to mean that protected activity encompassed conduct preparing for "a private *qui tam* action or assisting in an . . . action brought by the government." *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir. 1996); *accord Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994). In these circuits, an employee who, for example, reported a False Claims Act violation to her supervisor but did not pursue a *qui tam* action had not engaged in protected activity. *See, e.g.*, *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 914 (4th Cir. 1997). Other circuits, by contrast, read "in furtherance of" more broadly to include protection against "retaliation for filing an internal complaint." *United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1108–09 (7th Cir. 2014) (describing the Seventh Circuit's pre-2009 precedent).

Congress resolved this circuit split in 2009. That year, it amended

74

the False Claims Act's whistleblower protections to protect employees who take "lawful" actions "in furtherance of *other efforts to stop 1 or more violations*" of the False Claims Act. 31 U.S.C. § 3730(h)(1) (2009) (emphasis added). With this amendment, Congress thereby expanded "the universe of protected conduct."[18] *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 97 (2d Cir. 2017). In this expanded universe, whistleblowers who lawfully try to stop one or more violations of the Act are protected, without regard to whether their conduct advances a private or government lawsuit under the Act.

Congress did amend the whistleblower protections again in 2010. As a consequence, the now-effective protections expressly apply to an employee's "lawful" acts "in furtherance of" *either* "an action" under the Act "or other efforts to stop 1 or more violations of" the Act. 31 U.S.C. § 3730(h)(1); *see also United Stated ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 201 & n.3 (4th Cir. 2018) (noting these two amendments to the Act). But as is evident, the 2010 amendment left intact the 2009 amendment's broad "other efforts to stop" language, which is our focus in

---

[18] *See also United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 201 (4th Cir. 2018) ("[W]e and other circuits have recognized that the amended language broadens the scope of protected activity."); *Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847–48 (7th Cir. 2012) (noting the broader scope of protected activity under the amended provision).

this appeal.  Thus, Ms. Reed could avail herself of this "other efforts to stop" language in this action.

The district court, however, failed to acknowledge the expanded universe that the 2009 amendment defined.  Instead, it assessed the sufficiency of Ms. Reed's averments under the pre-2009 rubric.  In this regard, the court wrongly declared that under the False Claims Act "the activity prompting plaintiff's discharge must have been taken 'in furtherance of' a[] [*qui tam*] action."  Aplt.'s App. at 417 (quoting *McBride*, 688 F.3d at 703–04).[19]  The plain text of the amended whistleblower provisions does not support such a narrow view.  Congress added the "other efforts to stop" language for a reason—namely, to stretch

---

[19]     Although we decided *McBride* in 2012, the conduct at issue there occurred in January 2009—before the 2009 amendment took effect in May of that year.  *See* Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4(f), 123 Stat. 1617 (2009) (effective date May 20, 2009).  *McBride*, then, had no reason to consider or apply the amended whistleblower provision.  Hence, its analysis is inapposite to post-2009 protected conduct.  That said, in a 2017 unpublished opinion, a panel of our court quoted *McBride* for the proposition that "without evidence that [plaintiff] was planning to report [defendant] to the government or file a *qui tam* suit, [plaintiff's] retaliation claim cannot survive summary judgment."  *Cash v. Lockheed Martin Corp.*, 684 F. App'x 755, 764 (10th Cir. 2017) (unpublished) (quoting *McBride*, 688 F.3d at 704).  That seeming declaration of post-2009-amendment law (embodied in a 2017 decision) is of course not binding on us; *Cash* is not precedential.  *See* 10TH CIR. R. 32.1(A).  More fundamentally, *Cash* is problematic because (1) it is contrary to the plain text of the current (i.e., post-amendment) whistleblower provisions, (2) contains no analysis of the change in statutory language, and (3) conflicts with the decisions of our sister circuits that have construed the current provisions, *see, e.g.*, *Grant*, 912 F.3d at 201.  Accordingly, we decline to follow *Cash*'s lead, and KeyPoint's reliance on *Cash* is unavailing.

the "protected activity" umbrella to cover additional conduct. When "Congress expands the scope of activity protected by a statute, we cannot restrict ourselves to applying a narrower old standard that the expansion . . . eschew[ed]." *Grant*, 912 F.3d at 201. The district court mistakenly did just that. Tellingly, the phrase "other efforts to stop" does not appear in the district court's order, and the court fails to cite a single case applying the amended provision. Simply put, the district court applied the wrong version of the statute.

This error necessarily affected the district court's consideration of whether Ms. Reed adequately pleaded notice. To adequately plead a retaliation claim, a plaintiff must aver that the defendant was on notice of her protected activity. *See Armstrong*, 897 F.3d at 1286. Once Congress expanded the scope of protected activity, the universe of conduct that a plaintiff could allege to show notice also necessarily expanded. *See United States ex rel. Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 434 & n.6 (4th Cir. 2015) (explaining that the amendment expanded the boundaries of what constitutes notice of protected activity). But because the district court thought that only conduct *in furtherance* of a *qui tam* lawsuit was properly classified as "protected activity," the court asked the wrong question—an improperly narrow one. It asked only whether Ms. Reed pleaded facts

77

sufficient to show that KeyPoint was on notice that she was "taking action in furtherance of a private *qui tam* action or assisting in an . . . action brought by the government." Aplt.'s App. at 417 (quoting *Ramseyer*, 90 F.3d at 1522). And the court answered that question in the negative and, accordingly, dismissed Ms. Reed's claim.

But as framed by Ms. Reed's arguments, the right question regarding the notice element of the retaliation claim centers on the language Congress added to the Act in 2009. The district court should have gone beyond its previous inquiry and asked whether Ms. Reed pleaded facts that plausibly show that KeyPoint was on notice that she had tried to stop its alleged False Claims Act violations. The answer to that question determines whether Ms. Reed's retaliation claim stands or falls. Reviewing her complaint de novo, we answer that question in the negative.

**B**

Specifically, we hold that Ms. Reed has not pleaded sufficient facts to state a claim of retaliation because she has failed to establish the notice element of that claim. We explain that conclusion in two parts. First, we clarify what kind of facts Ms. Reed must plead to show that KeyPoint knew she was trying to stop its violations of the False Claims Act. Second, we determine that Ms. Reed's complaint averments come up short.

78

**1**

Our circuit has yet to begin the work of defining the boundaries of what constitutes protected efforts to stop a violation of the False Claims Act. Naturally, we cannot narrow our consideration to our pre-2009 view that an employee must prove in every instance that the employer knew that she was acting "in furtherance of" a *qui tam* action. *Ramseyer*, 90 F.3d at 1522. Beginning the outline of those boundaries, we state our agreement with KeyPoint "that a relator's actions still must convey a connection to the [False Claims Act]." Aplee.'s Resp. Br. at 52; *see Grant*, 912 F.3d at 202 (noting that "plaintiff's actions need not lead to a viable" *qui tam* action, but "they must still have a nexus to a[] [False Claims Act] violation"); *United States ex rel. Booker v. Pfizer, Inc.*, 847 F.3d 52, 59 n.8 (1st Cir. 2017) (explaining that relator's "activities must pertain to violations" of the Act). After all, the text of the amendment says the "other efforts" must be "to stop 1 or more violations of [the False Claims Act]." 31 U.S.C. § 3730(h)(1).

We also agree with KeyPoint that compliance employees typically must do more than other employees to show that their employer knew of the protected activity. Our cases applying the pre-2009 whistleblower provisions explained that an employee "whose job entails the investigation

79

of fraud . . . . must make clear" that she engaged in protected activity "to overcome the presumption that [she was] merely acting in accordance with [her] employment obligations." *Ramseyer*, 90 F.3d at 1523 n.7; *accord United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 729 (10th Cir. 2006). In other words, in these decisions, we recognized that an employer might reasonably presume that when a compliance employee reports incidents of fraud she is just doing her job. So to hold an employer liable under the Act's whistleblower provisions, our pre-2009 precedent required a compliance employee to overcome that presumption by showing that she was engaging in protected activity, not just doing her job.

We think this reasoning has survived the 2009 amendment. True, as we have explained above, that amendment expanded the scope of protected activity and thus expanded the universe of conduct that a relator may plead in giving the employer notice of the protected activity. But nothing about the 2009 amendment undercuts the rationale of our precedent addressing compliance officers who are charged by their employer with investigating fraud. *See United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 908 (9th Cir. 2017) (deeming our pre-2009 *Ramseyer* decision "instructive," in a post-amendment context, on the point that compliance employees must

80

do more to show an employer's knowledge), *cert. denied*, 139 S. Ct. 783 (2019).

In sum, to state a retaliation claim, as relevant here, an employee's complaint must allege facts that show her employer knew of her efforts to stop a False Claims Act violation. The 2009 amendment left intact our precedent requiring compliance employees to do more than other employees to meet the notice element. And so, to adequately plead notice, a compliance employee must allege facts that, viewed in her favor, make clear that her employer had been put on notice that she was trying to stop it from violating the False Claims Act and not merely doing her job.

**2**

We conclude that Ms. Reed's complaint averments come up short of this standard. To be sure, Ms. Reed is correct that her complaint shows that she voiced objections regarding the alleged fraud "to everyone at KeyPoint who would listen." Aplt.'s Opening Br. at 41. For instance, the complaint alleges that "she approached KeyPoint's Director of Training" and "raised concerns to her supervisor," the "OPM Contract Director," and "the Regional Managers and certain Field Managers." Aplt.'s App. at 31–32, ¶¶ 59, 65. Indeed, the complaint notes that Ms. Reed brought some of "the most egregious instances" of fraud at the investigator level to the attention

81

of "field managers and . . . regional managers." *Id.* at 62, ¶ 172. Likewise, Ms. Reed allegedly told "her supervisor . . . on numerous occasions" about violations of the TTP. *Id.* at 89, ¶ 253.

However, Ms. Reed was a "Senior Quality Control Analyst"—that is, a compliance officer. *Id.* at 24, ¶ 3. Thus, under our precedent, we may presume that Ms. Reed—as a compliance officer—was just doing her job in repeatedly reporting fraud internally to employees at KeyPoint. And Ms. Reed's complaint averments do not overcome that presumption—indeed, they tend to underscore the soundness of it. In this regard, Ms. Reed herself links her knowledge of, and efforts to report, the alleged fraud at KeyPoint to her role "as a Senior Quality Control Analyst."[20] *Id.* at 25, ¶ 4. For instance, the complaint notes that Ms. "Reed *and her staff* discover[ed]" fraud. *Id.* at 75, ¶ 201 (emphasis added). And at points, the

---

[20] *See also* Aplt.'s App. at 28–29, ¶¶ 29, 33 (noting that KeyPoint put Ms. "Reed in charge of the [TTP]," and through these duties, she "uncovered systemic violations" of the OPM contract); *id.* at 31, ¶¶ 52, 55 (noting that Ms. "Reed developed and ran" the TTP, and in that role, she "discovered that KeyPoint management repeatedly falsified corrective action reports by fabricating justifications for the violations"); *id.* at 33, ¶ 78 (explaining that Ms. Reed's job "allowed her to review investigators' work" and "compile[] extensive records of [improper] investigations"); *id.* at 61, ¶ 165 (alleging that when extra compliance work was needed, KeyPoint "occasionally tasked [Ms. Reed] with extra audits of investigators"); *id.* at 84, ¶ 228 ("Reed was assigned to determine the nature of the chronic infractions."); *id.* at 86, ¶¶ 231–232 (pointing out that "[i]n the course of her duties, Reed discovered that certain investigators were" circumventing OPM requirements); *id.* at 90, ¶ 260 ("Reed was tasked with investigating . . . each investigator's high frequency of telephone testimonies.").

complaint specifies that Ms. "Reed *and her staff* reported [certain] violations." *Id.* at 78, ¶ 207 (emphasis added); *see also id.* at 76, 80, ¶¶ 203, 210. That her staff was assisting Ms. Reed in fraud detection and reporting activities suggests that such activities fell within the ambit of Ms. Reed's responsibilities as a Senior Quality Control Analyst because one might reasonably infer that Ms. Reed's staff would not be assisting her in off-book operations or matters of personal preference, rather than duty. Even when Ms. Reed acted alone, the complaint suggests that she reported misconduct on a regularized schedule as part of her job—averring that she "regularly reported [certain] infractions to her supervisor . . . by submitting and discussing a *monthly spreadsheet*." *Id.* at 62, ¶ 171 (emphasis added); *see also id.* at 86, ¶ 230. And for investigators who persistently violated policies, Ms. Reed reported them "for disciplinary action by KeyPoint"—which strongly suggests that she had some job-related mandate to do so. *Id.* at 90, ¶ 265; *see also id.* at 36, ¶ 99.

In sum, as the district court correctly observed, "[T]he monitoring and reporting activities described in her Complaint were exactly those activities Ms. Reed was required to undertake . . . as a Senior Quality Control Analyst." *Id.* at 418–19. In other words, Ms. Reed's complaint averments do not rebut—and, indeed, tend to highlight the soundness of—the

83

presumption that her conduct was just part of her job.

Ms. Reed tries to rebut this presumption by showing that she went "outside [her] normal chain of command to report fraudulent conduct." Aplt.'s Opening Br. at 37. In this regard, Ms. Reed conclusorily asserts that she complained about the fraud to "people well outside her chain of command." *Id.* at 41. In particular, Ms. Reed avers that she reported the fraud to "the OPM Contract Director . . . , the Regional Managers[,] and certain Field Managers." Aplt.'s App. at 32, ¶ 65. Her complaint also refers to a conversation with "KeyPoint's Director of Training." *Id.* at 31–32, ¶ 59. By reporting fraud to these individuals, Ms. Reed argues that she "acted beyond the scope of her ordinary duties in attempting to stop KeyPoint's false statements" and that "[t]he KeyPoint employees who decided to fire [her] knew" as much. *Id.* at 108, ¶¶ 389, 396. Hence, Ms. Reed reasons, KeyPoint knew that her reports of fraud were not part of her job but, instead, efforts to stop False Claims Act violations.

KeyPoint disagrees. It says that Ms. Reed's actions were exactly what she "was required to undertake in fulfillment of her job duties" as a Senior Quality Control Analyst. Aplee.'s Resp. Br. at 53 (quoting *Ramseyer*, 90 F.3d at 1523). KeyPoint also denies that it was properly put on notice of Ms. Reed's protected activity because she ostensibly "went

84

outside of her usual chain of command." *Id.* at 55. Indeed, KeyPoint notes that Ms. Reed "does not cite any binding authority for the proposition that alleged discussions with individuals inside the company but outside of her normal reporting structure would suffice to overcome the presumption that she was acting within the scope of her ordinary duties." *Id.* at 56. Hence, KeyPoint argues that it "could not have been on notice of [Ms. Reed's] allegedly protected actions." *Id.* at 53.

KeyPoint is correct that our court has never expressly held that a compliance employee may put her employer on notice of her efforts to stop False Claims Act violations by reporting fraud internally but outside her chain of command. But other circuits have. The Ninth and D.C. Circuits, for example, each have held that, under certain circumstances, a compliance employee may meet the notice element of retaliation by pleading that her employer knew that she had reported fraud within the company in a manner that violated or went outside the established chain of command. *See, e.g.*, *Campie*, 862 F.3d at 897, 908 (holding that retaliation complaint by a "Senior Director of Global Quality Assurance" adequately pleaded notice because, *inter alia*, the employer knew the employee had "conversations outside of his chain of command regarding his concerns"); *United States ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1239–40 (D.C. Cir. 2012)

85

(holding that a compliance employee's retaliation claim survived summary judgment because employer knew she had "ignor[ed] 'the chain of command'" by reporting fraud to her boss's boss); *cf. United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1261 (D.C. Cir. 2004) (stating the general proposition that "when an employee acts outside his normal job responsibilities or alerts a party outside the usual chain of command, such action may suffice to notify the employer that the employee is engaging in protected activity," in a case in which the employee "went outside the company and alerted the government").

We need not definitively opine here, however, on the cogency of this precedent. Even if Ms. Reed could legally overcome the compliance-employee presumption by showing that she went outside of the chain of command to report fraud, her complaint averments do not plausibly establish, as a factual matter, that she did so. That is, she has not pleaded facts showing that she indeed went outside her ordinary reporting structure as a compliance officer. To be sure, we must "assume the truth of all well-pleaded facts in the complaint[] and draw all reasonable inferences" in Ms. Reed's favor. *Leverington v. City of Colorado Springs*, 643 F.3d 719, 723 (10th Cir. 2011) (quoting *Dias v. City & County of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009)). And Ms. Reed avers that she reported fraud to

persons other than her direct supervisor—namely, "the OPM Contract Director. . . , Regional Managers[,] and certain Field Managers," as well as the "Director of Training." Aplt.'s App. at 31–32, ¶¶ 59, 65. But Ms. Reed never pleaded facts delineating her specific job description or defining the scope of her duties such that we could discern with some specificity the contours of Ms. Reed's chain of command or ordinary reporting structure related to fraud matters. Without that information, we cannot say, or reasonably infer, that Ms. Reed broke the chain of command or ordinary communication protocol by speaking with the Director of Training, OPM Contract Director, Regional Managers, or Field Managers.

For example, as a compliance officer, Ms. Reed may have been obliged as part of her job duties to communicate with, and seek remedial action from, those at KeyPoint other than her direct supervisor regarding instances of employee fraud—especially if her supervisor did not adequately respond to her concerns. If so, that Ms. Reed turned to, for example, the Regional Managers or Field Managers to address her fraud concerns could not properly be viewed as an instance of Ms. Reed violating the established communication protocol or chain of command. Ms. Reed's complaint averments shed no appreciable light on whether her job description did in fact contemplate such communications beyond her direct

supervisor—much less negate this possibility.

Tellingly, in responding to KeyPoint's similar comments regarding factual gaps in her complaint, the best that Ms. Reed seemingly could muster in her Reply Brief was a plea for merciful forbearance: "With respect to her retaliation claim, [Ms. Reed] is arguing that, at the motion to dismiss stage, she *gets the benefit of the doubt*." Aplt.'s Reply Br. at 22 (emphasis added). But the one case that she cites for support—*Gee v. Pacheco*, 627 F.3d 1178 (10th Cir. 2010)—says no such thing. That case and other controlling decisions make quite clear that, "[t]o survive a motion to dismiss," a plaintiff's complaint averments must be factually plausible. *Id.* at 1184 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). And that plausibility standard is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678). As relevant here, Ms. Reed had to plead facts from which we could reasonably infer that she put KeyPoint on notice of her protected activity by going outside the established communication protocol or chain of command. But she has failed to plead such facts.[21]

---

[21] Putting aside Ms. Reed's failure to demonstrate KeyPoint's notice through a chain-of-command theory, Ms. Reed's complaint averments do not provide sufficient facts from which we could conclude that the content of her communications with the

(continued...)

The D.C. Circuit's analysis in *Schweizer* offers a useful contrast.

Like Ms. Reed, the relator there was responsible for ensuring "compliance

with government contracts." 677 F.3d at 1239. Upon uncovering fraud, the

relator voiced concerns to her supervisor and then "repeatedly disobeyed

the orders of . . . her supervisor[] to stop investigating" the alleged fraud.

*Id.* In fact, the relator went over her boss's head to his supervisor "on two

separate occasions." *Id.* In those conversations, "she alleged a variety of

specific False Claims Act violations" and "made an emotional plea to

'sav[e] the company' from 'legal trouble.'" *Id.* at 1239–40 (alteration in

---

[21](...continued)
identified KeyPoint officials would have put KeyPoint on notice that she was doing something more than her job. For example, regarding Ms. Reed's conversation with the "OPM Contract Director," we do not know which "concerns" she voiced or whether voicing those unspecified concerns was inconsistent with her job duties. Aplt.'s App. at 32, ¶ 65. It is the same story with Ms. Reed's discussions with "the Regional Managers and certain Field Managers." *Id.* And, as to the Director of Training, we are especially hard-pressed to see how Ms. Reed's communications with that official would have alerted KeyPoint to the fact that she was seeking to prevent the company from committing a violation the False Claims Act. Specifically, Ms. Reed's complaint speaks of the problems that the Director of Training brought to Ms. Reed's attention—not the other way around. *See id.* at 32, ¶¶ 60–63. That the Director of Training reported problems to Ms. Reed tells us nothing about whether KeyPoint knew of *Ms. Reed's* efforts to stop a False Claims Act violation. Therefore, her complaint averments regarding the content of her communications with the identified KeyPoint officials do not aid her argument that KeyPoint was on notice of her protected activity. Moreover, lest there be any doubt, Ms. Reed's averments also cannot support a reasonable inference that her reports of fraud to her direct supervisor were outside her ordinary job duties. In fact, the complaint suggests otherwise. Recall that Ms. Reed often reported violations "to her supervisor . . . by submitting and discussing a monthly spreadsheet." *Id.* at 62, ¶ 171. Ms. Reed's descriptions of these meetings with her direct supervisor strongly suggest that she was just doing her "regular monthly duties." *Id.* at 38, ¶ 127.

original). Some weeks later, "[t]he company fired" the relator. *Id.* at 1240. Her termination letter specified that she was fired for "'refusing to follow orders' and ignoring 'the chain of command.'" *Id.* From this evidence, the D.C. Circuit held that the relator's "factual allegations [were] sufficient to overcome 'the presumption that [she was] merely acting in accordance with [her] employment obligations.'" *Id.* (second and third alterations in original) (quoting *Williams*, 389 F.3d at 1261).

Measured against the allegations in *Schweizer*, the paucity of the factual content in Ms. Reed's complaint averments is patent. Unlike in *Schweizer*, we have no specifically pleaded facts here indicating that Ms. Reed violated the chain of command in reporting suspected fraud to KeyPoint officials other than her direct supervisor. Whereas the relator in *Schweizer* was ordered to stop investigating the fraud, Ms. Reed was "tasked with extra audits of investigators." Aplt.'s App. at 61, ¶ 165. And while the employer in *Schweizer* fired the relator for "failing to follow orders and the chain of command," 677 F.3d at 1240, we lack any specific—much less express—basis in Ms. Reed's complaint from which to infer that Ms. Reed's activities in reporting suspected fraud, in her capacity as a compliance officer, violated KeyPoint's established communication protocols or broke her chain of command. Simply put, Ms. Reed's

90

complaint averments fail to rebut the presumption that her actions were just doing her job.

* * *

In summary, Ms. Reed has the burden of pleading sufficient facts to show that KeyPoint knew of her protected activity. *See McBride*, 688 F.3d at 704. To do so, she must overcome the presumption that her internal reports of fraud were part of her job as a Senior Quality Control Analyst. This she cannot do. Accordingly, we hold that Ms. Reed has failed to adequately allege that KeyPoint was on notice of her efforts to stop its alleged False Claims Act violations. Consequently, her retaliation claim fails.

## IV

For the reasons stated above, we **VACATE** the district court's judgment and order insofar as it granted summary judgment on Ms. Reed's *qui tam* claims. We **AFFIRM** the district court's order insofar as it

dismissed Ms. Reed's retaliation claim.  And we **REMAND** for further

proceedings consistent with this opinion.[22]

---

[22]     We also **GRANT** KeyPoint's unopposed motion to seal Volumes II through VI of its unredacted supplemental appendix.  KeyPoint filed two versions of its seven-volume supplemental appendix, one redacted and one unredacted. KeyPoint moves to seal Volumes II through VI of the unredacted materials, which include OPM's contract with KeyPoint and OPM's Investigator's Handbook.  The public has a "right of access to judicial records." *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1135 (10th Cir. 2011); 10TH CIR. R. 30.1(D).  To seal court records and thus impair that right, a party "must articulate a real and substantial interest that justifies depriving the public of access to the records that inform our decision-making process." *Helm v. Kansas*, 656 F.3d 1277, 1292 (10th Cir. 2011).  Three considerations lead us to conclude that sealing is appropriate here.  First, KeyPoint has articulated a strong national-security interest in sealing.  The OPM contract and handbook contain sensitive materials regarding the techniques used in performing background checks; revealing this information could compromise future background investigations.  Second, KeyPoint has preserved the public's right to view judicial records by publicly filing a redacted version of the appendices proffered under seal.  This publicly available—albeit redacted— version of the appendices leaves the content of the appendices visible in significant measure.  Finally, sealing is appropriate because the documents at issue "play[ed] no role in our resolution of this appeal." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1246 n.14 (10th Cir. 2017).  Although KeyPoint's Response Brief references the unredacted materials, we did not rely on the underlying unredacted documents in deciding this appeal.